**Ex Parte Mark Anthony ZAPATA, Applicant.**

**No. AP–75784.**

Court of Criminal Appeals of Texas.

Oct. 10, 2007.

Cynthia Orr, San Antonio, for Appellant.

Matthew Paul, State's Attorney, Austin, for the State.

### *OPINION*

PER CURIAM.

Pursuant to the provisions of Article 11.07 of the Texas Code of Criminal Procedure, the clerk of the trial court transmitted to this Court this application for writ of habeas corpus. *Ex parte Young,* 418 S.W.2d 824, 826 (Tex.Crim.App.1967). Applicant was charged with sexually assaulting each of his three daughters. Applicant

---

pleaded guilty to one count of aggravated sexual assault of a child and was sentenced to fifteen years' imprisonment. On the day of sentencing Applicant moved to withdraw his plea, which was denied by the trial court Applicant Also filed a motion for a new trial, which was heard and denied.

On direct appeal the Fourth Court of Appeals held that under Appellate Rule 25.2(b)(3) it lacked jurisdiction to consider the merits of Applicant's claims. *Zapata v. State,* 121 S.W.3d 66 (Tex.App.-San Antonio, 2003, pet. ref'd).

In this writ Applicant contends, *inter alia,* that his plea was involuntary because at the time he entered it he was not aware that the complainants had recanted their accusations and would not have testified against him in a trial. Applicant learned of the recantations after the entry of the plea but before sentencing. He was unable to produce his daughters to testify at the sentencing hearing in support of his motion to withdraw his plea, because their mother drove up from Corpus Christi the night before the hearing and took the complainant and her sisters away with her.

The trial court held a hearing on Applicant's writ of habeas corpus. At the hearing, Applicant testified that he misunderstood counsel's use of legal terminology at the time of the plea, and believed incorrectly that he could withdraw his plea at any time before sentencing. He admitted to telling the probation officer who conducted the pre-sentence investigation interview that he had committed various offenses against his daughters. However, Applicant testified at the habeas hearing that he fabricated the admissions because he believed that he would be more likely to obtain a more lenient sentence if he admitted guilt.

Two of Applicant's three daughters testified at the habeas hearing, and both testified that Applicant had never touched them inappropriately or had sex with them. They testified that they had accused Applicant of sexually abusing them because they were angry at him for wanting to divorce their mother and that they had been misled during interviews with sexual assault investigators and prosecutors. Applicant's third daughter, who had earlier recanted her accusations against Applicant, had planned to testify for the State at the habeas hearing. However, Applicant filed a motion to exclude her testimony on the basis that she had been in the courtroom throughout the proceedings, in violation of the rule of sequestration. The third daughter did not testify for the State or for Applicant at the habeas hearing.

The trial court has entered findings of fact and conclusions of law finding that the witnesses who testified for Applicant at the habeas hearing were credible and concluding that Applicant should be permitted to withdraw his plea. The trial court's findings are supported by the habeas record. At the time of Applicant's motion to withdraw his plea, he was unable to produce the recantation testimony of his daughters, through no fault of his own. In light of the new evidence presented at the habeas hearing, it appears that Applicant's plea was not knowingly and voluntarily entered. Relief is granted. The judgment in Cause No. 2001CR3607–W1 in the 290th Judicial District Court of Bexar County is set aside, and Applicant is remanded to the custody of the Sheriff of Bexar County to answer the charge against him.

Copies of this opinion shall be sent to the Texas Department of Criminal Justice—Correctional Institutions Division and Pardons and Paroles Division.

HERVEY, J., filed a dissenting opinion, in which KELLER, P.J., and KEASLER, J., joined.

MEYERS, J., dissented.

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER, J., joined.

I respectfully dissent. Applicant received a 15–year prison sentence after pleading guilty to aggravated sexual assault of his daughter, Brittny. Applicant relies on Brittny's recantation to now claim that he is "actually innocent" and that his guilty plea was untruthful. The convicting court found that Brittny's recantation was "credible" and concluded that:

> Having found [Brittny] to be credible, the court finds that Applicant has satisfied his burden as required by *Tuley*. *Ex parte Tuley*, 109 S.W.3d 388 (Tex. Crim.App.2002). As such, it is the recommendation of this court that this application should be **GRANTED** and Applicant's plea withdrawn.

(Emphasis in original).

This Court, however, grants applicant habeas corpus relief on the basis that his guilty plea was involuntary.

Applicant was charged in an eight-count indictment with aggravated sexual assault of his three daughters (Melissa, April and Brittny) each of whom described in detail to different people at different times how applicant sexually abused them. The girls described numerous acts of fondling and penetration by applicant. There was also physical evidence that supported these allegations. The oldest child (Melissa) had a sexually transmitted disease (chlamydia) and a "gaping" hymen which is not "commonly seen in children that haven't been abused" and which is suggestive of "penetrating acts of trauma." The genital area of the youngest child (Brittny) had abrasions normally associated with "chronic penetration."

On July 8, 2002, the State and applicant, who was represented by experienced counsel, entered into a plea-bargain. Applicant agreed to plead guilty to one of the counts involving Brittny. The record of the plea proceeding reflects that applicant pled guilty with a complete understanding of the nature of the constitutional protections that his guilty plea waived (including his right to a jury trial) and a complete understanding of the charge to which he was pleading guilty. *See generally Gardner v. State*, 164 S.W.3d 393 (Tex.Cr.App.2005).

In exchange for applicant's guilty plea, the State agreed to recommend a 15–year cap on punishment which meant that applicant could seek deferred adjudication probation from the trial court (but not a jury). The convicting court accepted applicant's guilty plea, ordered the preparation of a pre-sentence investigation report (PSI), and set the matter for sentencing on August 8, 2002. Prior to sentencing, applicant met with a probation officer for the PSI and admitted to fondling the children but denied penetrating them.

Applicant testified at the habeas hearing that, after pleading guilty to sexually assaulting Brittny, he met with the girls and explained to them that he was going to prison "as a result of what they said."[1] Very soon after this, information began

---

1. The record is not entirely clear on exactly when this occurred. Applicant testified on cross-examination at the habeas hearing:

Q. [STATE]: You spoke to all three of them at the same time after pleading guilty to sexually assaulting Brittny, correct?
A. Yes, sir.
Q. All right. And what did you tell them?
A. I had answered some of their questions that they had about my case. They didn't know I was going to prison, so, of course, I let them know a little bit about what was going on because they were in the dark about it.
Q. All right. So, you told these young girls that as a result of what they said that you were going to prison?
A. Yes. According to records that I was shown, yes.

"percolating" that two of the girls (Melissa and Brittny) had recanted their allegations of sexual abuse against applicant. One of the prosecutors (Melton) in the case testified at the habeas hearing that this information began "percolating" only after applicant's attempt to obtain deferred adjudication probation failed. The other prosecutor (Guzman) testified that he first heard that the girls "may be changing their story" just before the sentencing hearing.

Applicant attempted to withdraw his guilty plea at his August 8, 2002, sentencing hearing.[2] He claimed that his guilty plea was involuntary because he misunderstood the term "discretion" as it related to the convicting court's discretion to permit him to withdraw his plea. Applicant claimed that he believed that he had an absolute right to withdraw his plea prior to sentencing.[3] Applicant also claimed that his guilty plea was involuntary because he thought that he would be able to present evidence to a jury at his sentencing hearing while at the same time seeking deferred adjudication from the convicting court.[4] Applicant also told the convicting court that he made up the fondling admissions to the probation officer "basically to put a circus together for [the convicting court] to give [him] deferred adjudication."

> [THE COURT]: Let me ask you something, Mr. Zapata. When you talked to the probation officer, did you give them this version about what you did with your daughter?
>
> [APPLICANT]: Yes, ma'am, I did. And the reason I did that is because—
>
> [THE COURT]: Did you just make all this sex activity up when you talked to the PSI officer?
>
> [APPLICANT]: Yes, ma'am, I did.
>
> [THE COURT]: You did. Uh-huh.

2. Applicant's motion to withdraw his guilty plea alleged that:

> 1. The Defendant is actually innocent of the charge against him.
> 2. The Defendant believed that the waiver of trial by jury at the beginning of the process was limited to a jury making initial determinations of guilt/innocence. Mr. Zapata believed that a jury would decide his ultimate sentence.

3. Applicant's counsel explained to the convicting court at applicant's sentencing hearing:

> [APPLICANT'S COUNSEL]: I discussed with him how I had explained to him the nature of plea bargaining. And I didn't know really how he got that idea. And I do now know where he got that idea, because he asked me if—In the beginning before he entered a plea, he had asked me about this process, and he had asked me if he was able to withdraw his plea if circumstances changed and he changed his mind, and I told him that that was discretionary with the Court. And that was the end of the inquiry, and I thought he understood that. And later on when we began to discuss that again, it became clear to me that in Mr. Zapata's vocabulary, he didn't get what "discretionary" meant. He thought that prior to being sentenced in this case he could withdraw his plea based upon any circumstances that changed that he thought he should bring to your attention.

4. One of the prosecutors in the case testified at the habeas hearing that she had never heard of such a procedure:

> Q. [STATE]: Do you know of any provision under the law in the State of Texas wherein a defendant can enter into a plea bargain with the State, waive a jury, apply for deferred adjudication from the Judge and have a jury assess punishment?
> A. [PROSECUTOR]: No.
> Q. Did you ever hear [applicant's counsel] make any remarks to his client that implied that that kind of procedure was about to unfold in his case?
> A. No. And [applicant's counsel], from my experience in dealing with him in the courthouse has been, is very thorough with his clients when he goes over the plea paperwork and preparing them for the plea and for sentencing.

[APPLICANT]: I will give you a reason for that.

[THE COURT]: Oh, I can hardly wait to hear it. Let me hear it.

[APPLICANT]: Your Honor, the reason I made that up is because I felt that if I said those things, that the Court would see leniency for me in coming forward and agreeing—and saying to [sic] things that the State was saying that I was doing. That if I would come forth to the Court and say, Your Honor, I did these things and I want to be punished for it, I thought that I could have my doctor come up here and talk about things that I have talked to him about and let you— and basically to put a circus together for Your Honor to give me deferred adjudication. Just plain and simple, a circus that was put together because I never thought that my kids—I would ever talk to my kids again. After talking to my kids the last 10 days, Your Honor, it is very important that somebody do something for them. You could send me to jail today, but I want them separated from their mother at least, Your Honor.

Applicant did not reference any written recantations from any of the girls as a basis for withdrawing his guilty plea at the sentencing hearing. The convicting court denied applicant's request to withdraw his guilty plea and sentenced him to 15 years.

Applicant filed a written motion for new trial which reasserted his involuntary guilty plea claim and which asserted a claim that he was "actually innocent,"

based on Melissa's and Brittny's written recantations dated July 29, 2002.[5] These recantations were attached as exhibits to applicant's motion for new trial. At the motion for new trial hearing, applicant requested that he be allowed to withdraw his guilty plea mainly for the reasons previously given at his August 8, 2002, sentencing hearing. The convicting court denied applicant's motion for new trial in September 2002.

The girls have been living primarily with applicant's mother. In March 2005, applicant filed a habeas corpus application which reasserted his involuntary guilty plea claim and which also asserted an "actual innocence" claim based on recantations from all three girls. Attached to applicant's habeas corpus application are Melissa's and Brittny's July 29, 2002, written recantations that were also attached to applicant's motion for new trial. Applicant's habeas corpus application included two more written recantations by Brittny dated October 20, 2004, and March 15, 2005, and April's two written recantations dated October 19, 2004, and March 15, 2005. Melissa did not provide any more written recantations. And, there is some indication that Melissa has recanted her July 29, 2002, recantation.[6]

April and Brittny testified at the habeas hearing that applicant did not molest them. They testified that they falsely accused applicant of molesting them because they were angry about his plans to divorce their mother. They testified that they did not remember much about their prior

---

5. The convicting court's findings state that applicant's motion for new trial was supported with "affidavits from all three of the alleged victims stating that the allegations of sexual assault against [applicant] were absolutely false." The record does not support this finding because only two of the "alleged" victims (Melissa and Brittny) filed affidavits.

6. It should be noted that applicant filed a motion to prevent Melissa from testifying for the State at the habeas hearing based, in part, on Melissa's "inappropriate conduct" during the habeas hearing, such as calling applicant's "witnesses liars in the hallway outside the courtroom." The habeas record, however, does not reveal exactly why Melissa did not testify at the habeas hearing.

statements to the various professionals who investigated their allegations against applicant and that the prosecutors pressured them into agreeing that applicant molested them. For example, April testified:

Q. [APPLICANT'S WRIT COUNSEL]: Do you remember telling me on—here today, that you talked to a Ms. Jackson?

A. That I talked to Ms. Jackson?

Q. Yes.

A. Yes, ma'am.

Q. You want to tell me about that, where did that happen?

A. I remember a little that it happened at Baskin Elementary. We had an interview.

Q. Okay. And do you remember what you told her during that interview?

A. Not really. I just remember the room that we went into.

Q. Okay. Do you remember if you told her that your dad had sex with you or touched you in a way he should not?

A. No, ma'am.

Q. You don't remember or you did not tell her?

A. I don't remember.

Q. Okay. Did you ever talk to a lawyer that works for the State of Texas?

A. Would that be a DA?

Q. Yes.

A. Yes, ma'am.

Q. Who was that?

A. Mr. Ed Guzman.

Q. Okay. And what did you tell Mr. Guzman about whether your dad had sex with you or touched you in a way he should not?

A. I did not tell Mr. Guzman any of that. I only agreed with what he would ask.

Q. And what did he ask you?

A. He asked me questions like, your sisters said that your dad did some stuff with them or had sex with them, and did that happen to you? Because they said it happened to you, and I would just like, yes.

Q. Why did you agree with him?

A. I felt kind of pressured. And he promised that my dad would get to come home and that my family would be together again.

Q. Was that a truthful answer? Is it true that your dad touched you in a bad way that he shouldn't?

A. No, ma'am.

The prosecutors involved in applicant's case denied that they engaged in any of this unethical conduct. They testified that the procedures they used to interview the children were not suggestive and were designed to ascertain the truth. They also testified that they did not promise the children that applicant would not go to jail. For example, the lead prosecutor (Guzman) testified about the "normal course of preparing an aggravated sexual assault case" which he followed in this case.

Q. [STATE]: All right. What was your purpose in speaking with those girls?

A. In the normal course of preparing an aggravated sexual assault case like that, I'll speak to the children initially to determine whether or not they do have a recollection of what's contained in all the evidence and information and documentation that's been provided to me. So, I'll do that.

Essentially, in that first conference with them and then I might have a second or third, depending on how long the case goes on and when trial comes up to verify information and make sure their recollection is consistent and, you know,

that I think it's a case that is going to hold up to trial.

Q. All right. Now, was it your practice to speak with these girls or complainants separately?

A. Yes.

Q. And why was that?

A. Obviously, if you talk to the three of them together, there is a good danger of cross contamination. One girl may say something, the other girl may decide that maybe they are saying it in a way that's better than the way they would have said it or, you know, it just makes things messy. You need to keep everybody contained and have them tell the story their own way, have them relate what they remember happened to them specifically in their own words without any sort of, you know, like I said, cross contamination with any other kind of witness.

Q. Did you attempt to proceed in that manner in this case?

A. Yes.[7]

The other prosecutor (Melton) in the case testified that she believed the girls were truthful during her interviews with them primarily because of the specific details they provided. For example,

Q. [STATE]: And did [April] provide you with what you believed to be a complete, as you can get from a girl that age, view of the facts that form the basis of the indictment?

A. She did. Again, similarly to Brittny, she went into very specific detail on multiple occasions where [applicant] had either fondled her or penetrated her. She was able to give me location, time of day, surrounding circumstances. On one occasion he showed her a pornographic magazine and then proceeded to go ahead and fondle her and later penetrated her. She was able to give me detail that was very clear and very centered around particular incidents. It was not a general, my dad touched me sometime down the road. It was very specific.

Applicant presented the testimony of a medical expert (Arambula) who criticized some of the procedures used to interview the children.[8] He seemed to suggest on direct examination that a single improper leading question by a child protective services investigator (Jackson), to one of the children during an initial interview, could have tainted everything the children said after that. Arambula clarified this on cross-examination.

Q. [STATE]: Dr. Arambula, the children in this case were 9, 11 and 12 years old when they were interviewed. Is that correct?

A. I think that's right. Yes, ma'am.

Q. Okay. Are you suggesting that one poor question by Joanne Jackson to one of the children reformed the memory of all three children prior to their interview with Dr. Kellogg?

A. No, I didn't say that. I just had a red flag concern about that particular aspect of that particular examination.

Q. Okay. Her question was—[applicant's writ counsel's] general question to

---

7. Guzman also testified about an incident during a docket call in the courtroom during which he found it necessary to tell applicant's brother to leave the girls alone because the brother was upsetting them in the back of the courtroom.

8. Arambula expressed some doubt that April had been abused because a medical examination revealed that her hymen was intact. He seemed genuinely surprised to learn that it is not uncommon "that the hymen can be completely entact (sic) when penetration and, in fact, pregnancy have occurred as a result of that penetration."

you whether a leading question in one interview can taint that entire—can taint all of these other interviews, that is a general response. You are not suggesting that one poor question from Joanne Jackson tainted the interviews, subsequent interviews, of Brittny, April and Melissa, are you?

A. It's not apparent in the notes that it could—that it would do that. It's possible if she talked with her other two sisters afterward, but I don't know.

Q. And isn't it correct when you looked at all three interviews relating to the medicals of the girls that all three gave distinct and different details in regards to what occurred to them?

A. The manner in which they said things were different from one another, but there were some similarities. And it evolved over time—the stories of their experiences became, I guess, more expanded.

Q. And isn't that typical of children that they will typically outcry and then divulge in that kind of a manner where they become more comfortable? Isn't that the reason that you suggested to the Court the two or three interviews was appropriate to begin getting this information? Because as children become more comfortable that they are now safe they begin to actually tell the full breadth of the abuse as it occurred to them?

A. They can happen in either case, yes, it can happen in some things authentic.

Melton testified that she did not believe that her interviews with the children were tainted by anything that "Jackson did with them."

Q. [APPLICANT'S WRIT COUNSEL]: You heard Dr. Arambula's indication that there was answers suggested to them in those interviews. If that is true, is that problematic to you?

A. Well, I believe that Dr. Arambula said in one transcript he found a single question where the question seemed to precede the answer. That does not bother me in the sense that if the entire interview were leading and if the children were being fed answers at every question, that would certainly bother me. If one question was with one child jumped a step ahead, my guess is that's probably not going to impact the faith of their interviews in general. Having read Ms. Jackson's transcripts, I know that my interviews and Ed Guzman's interviews with the children were much more extensive and covered a lot more ground and had a lot more detail that never appeared in Ms. Jackson's interviews.

So, I know the material they were telling me was not tainted by anything Ms. Jackson did with them, because she never covered the bulk of what we covered with the kids.

Applicant also presented the testimony of a psychiatrist (Potterf) who testified that applicant did not have "any of the antibodies for chlamydia" which led Potterf to conclude that applicant never had chlamydia. This was based on a March 2002 blood test performed by someone else, who was not called to testify at the habeas hearing. The State's medical witness (Kellogg), who examined the girls in February 2000, did not rebut Potterf's testimony that applicant did not have "any of the antibodies for chlamydia." Instead, Kellogg provided testimony that she has never "come across another professional pediatric individual or someone involved in child abuse who accepts a blood test that looks for antibodies of chlamydia." [9]

9. Kellogg is a professor of pediatrics at the University of Texas Health Science Center,

Q. [STATE]: Okay. Now, Dr. Kellogg, can you explain—let's just talk about chlamydia. Can you explain what chlamydia is, what it does in the body and then how one should test for it or can test for it to your knowledge?

A. Okay. Chlamydia is a sexually transmitted disease and it is bacteria. And it lives inside of cells. And that's a little bit unusual, because most bacteria would attach to the outside of a cell, but this one is inside the cell which is why when you test for it, you have to actually get the live cell and submit it to a testing technique.

Q. So, what types of tests could you use to find out if chlamydia was there?

A. Chlamydia culture, there are also nucleic acid amplification tests. And what those do is you look for the actual DNA of chlamydia. There are those tests that are also possible. These are all swabs. In the female we're talking about swabbing the genital or swabbing inside the penis in a male. Sometimes some of these tests can be done from urine.

Q. Can a test as you're talking about be done from blood?

A. I'm not aware of it—of that being done or that being accepted as a test. I haven't seen that.

Q. And, Dr. Kellogg, based on your particular position in the scientific community and specifically in the area of child sexual abuse, is this an area that you keep current with?

A. Is this—

Q.—an area that you keep current with?

A. Yes, I do. I try to, yes.

Q. Is it, in fact, an area that you speak on throughout the country?

A. Yes, I do.

Q. In all of your experience, have you ever come across another professional pediatric individual or someone involved in child abuse who accepts a blood test that looks for antibodies of chlamydia?

A. No, I haven't.

Q. Okay. Why won't an antibody test work for chlamydia?

A. Antibodies in the body are formed when a bacteria or foreign organism sticks on the outside of the cell. That has to happen. Because to make antibodies, the body has to recognize something foreign. This doesn't belong in my body, I need to make antibodies to it.

* * *

A. As I mentioned before, chlamydia lives inside of the cell, so the formation of an antibody would not be an expected result. I mean, maybe it occurs to a small extent, but it's not a reliable— that's not an anticipated response to chlamydia.

Kellogg provided more testimony on cross-examination that she also has expertise in infectious diseases and that she was not aware "of any child abuse expert in the country that uses chlamydia antibodies in any way, shape or form to investigate child sexual abuse." Kellogg testified that she disagreed with Potterf's testimony.

and she is the Medical Director of the Alamo Children's Advocacy Center and the Medical Director of the Sexual Assault Nurse Examiners Program at the Christus Santa Rosa. She has examined approximately 8,500 suspected child victims of sexual abuse. Kellogg testified that, when she examined the girls in February 2000, it was discovered that Melis-sa, who was 12 years-old, had chlamydia and a "gaping" hymen. Kellogg testified that Melissa denied having sexual contact with anyone other than applicant. Applicant's mother testified that Melissa confided to her that she "contacted" chlamydia from another boy when she was 12 years-old.

Q. [APPLICANT'S WRIT COUNSEL]: That's really what I was trying to get at. When I rose to ask to take you on voir dire, my question concerned whether you have any expertise in infectious diseases?

A. I do, yes.

Q. And what is that?

A. I've conducted research in the area of sexually transmitted disease, I've published that research and I have presented my research and knowledge regarding sexually transmitted diseases at a number of national and international conferences.

Q. So if Dr. Potterf, who has expertise in infectious diseases, came and testified that antibodies for chlamydia, if they are in a person, if a person has them, that would always be there if they ever had chlamydia, you would disagree with that testimony.

A. Yes, I would. I think that if that test was really accepted, I would expect my peers to utilize it. And I'm not aware at this moment of any child abuse expert in the country that uses chlamydia antibodies in any way, shape or form to investigate child sexual abuse. So, I guess I disagree based on my current knowledge.

Apparently in an attempt to explain the abrasions in Brittny's genital area, applicant and Brittny testified that Brittny had surgery in her genital area at birth to correct a birth defect and that this surgery left scarring. Kellogg, however, presented contradictory testimony that the abrasions observed in Brittny's genital area were very recent and consistent with repeated penetration and not some surgery that may have occurred at birth.

Q. [STATE]: Now, Dr. Kellogg, were there some findings by Laurie Long in the medical portion or the physical portion of the exam?

A. Yes.

Q. Can you talk about those findings and what they mean?

A. Yes. She notes three findings. The first one is one centimeter linear acute abrasion, and that is located in what we call the vestibule, which is the tissue immediately surrounding the hymen.

There's also a 1.5 centimeter linear acute abrasion just to the side of that one. And this is—location-wise we're talking on the patient's right side at the bottom part of the vestibule, the tissue that surrounds the hymen.

She also noted a thin hymenal rim circumferentially. What that means is the hymen is a round ring structure, and all of the—there's very little hymen, that's what she means by that. There's very little hymen all the way around. It's there, it's there, it's complete but there is very little of it. You asked about the significance of the finding?

Q. Yes, ma'am.

A. The abrasions that were in the vestibule are acute findings, they are recent. That means something that happened within a couple of days. And the location of them is consistent with some type of penetrating trauma. The other finding, the hymenal rim being narrow, is a finding that may be supportive of penetration that's already in the past—prior.

Q. Suggestive, like you were talking about—

A. Yeah. In other words, there's an explanation for this. Penetration is one, but there are other possibilities for this. And basically, in terms of penetration being a cause, it's what's normally associated with chronic penetration, kind of wearing away the edges. Not tearing,

but actually just wearing away the tissue there.

Q. When you say "chronic", you mean repeated over the course of time?

A. Yeah. That's what I mean.

* * *

Q. Now, have you been made aware that [Brittny] supposedly had an operation of some kind at birth dealing with an enlarged labia minora?

A. I've been made aware of that, yes.

Q. Okay. Is this scar that you have observed—assuming that operation occurred and left some sort of scarring, is the scar that you observed in that same type of position or even in a different position in the female sexual organ?

A. It's in a different position in the female sexual organ.

Q. And the scar that you observed, what would it indicate to you?

A. Well, the location of the scar and the shape of the scar is mostly consistent with past penetration—penetrating trauma.

Kellogg also testified that it is not atypical for children to recant especially when, as here, they are living with the abuser's mother and the children are made to feel guilty "for the consequences of their disclosures." [10] Kellogg testified that the children's recantations did not change her conclusions "in regard to the medical findings and the history."

Q. [STATE]: Okay. Let's move on to the medical finding and talk a little bit about the dynamics of child sexual abuse, particularly when it involves family members. When a child is abused by a parent, does that raise any special issues for that child in terms of disclosure and in terms of going through the entire process as is involved once the child sexual abuse is reported?

A. Yes, it does raise issues.

Q. Okay. What kind of issues?

A. First of all, children that are sexually abused by family members are more concerned about the effect of their disclosure on other people. They are more worried about how their mother may respond and other family members may respond, and that can, in turn, effect [sic] what they say, how much they are going to say and how willing they are to say it.

Q. Do kids who are abused by a parent necessarily stop loving that parent?

A. No. About a third of our children still love that person.

Q. And does that also impact how they disclose or in what manner they disclose?

A. Yes, it does.

Q. What would you say—can you make any correlation between childrens' feelings in regard to their abuser and the propensity of children to recant their original allegations?

A. Yes.

Q. Okay. Go ahead.

A. If children feel bad about what happened after they disclosed, they are more likely to recant. If they sense that their mother does not believe them, they are more likely to recant. If they are made to feel guilty or responsible for the consequences of their disclosure, they are more likely to recant or take back what they said.

---

10. Applicant's mother (Grandma Red) testified at the habeas hearing that the girls became very emotional and upset when she told them that applicant had been sentenced to 15 years in prison. Grandma Red also testified that she is financing the legal efforts to get applicant out of prison.

Q. Okay. Is it atypical for children to recant?

A. It's not atypical, no.

Q. Hypothetically speaking, if children who had been in the care of someone who was supporting them, at least verbally, and taking them through the steps of child abuse reporting and investigation then gave them into the custody of an individual who was related—well, who was the mother of the perpetrator, might that raise some red flags as far as recanting issues?

A. Yes, it would.

Q. Would it in any way surprise you if [applicant's] mother is the one taking care of these children that a recantation were to occur?

A. It would not surprise me.

Q. And would that, in your mind, that a recantation occurred, mean that sexual abuse did not occur?

A. No, it would not mean that.

Q. Okay. Particularly, let me ask you, in relation to these findings that you have reviewed in all three of these girls' reports, if I were to tell you here in court that two of those children have recanted their statements, would that change your conclusions that we've discussed in regard to the medical findings and the history?

A. No, it would not.

11. The findings do not explain how Brittny can be a "complaining witness" when her testimony at the habeas hearing was that she was not sexually assaulted at all, which, in the final analysis and under applicant's factual theory at the habeas hearing, is what we must accept in order to grant applicant habeas corpus relief on his "actual innocence" claim. It would be very difficult to conclude that applicant has unquestionably established his innocence if the evidence established that Brittny and the other girls were, in fact, sexually assaulted.

In recommending that applicant be granted relief, the convicting court concluded that applicant established his "actual innocence," based on the convicting court having found "the complaining witness [Brittny] to be credible." [11] The convicting court also made the following finding apparently to explain why applicant would plead guilty to something that he did not do: [12]

10. Applicant also testified on his behalf during this hearing. He offered as an explanation that he admitted to the probation officer that he committed this offense in an effort to gain leniency from the court. Applicant stated his lawyer told him that in his lawyer's experience, the courts were more willing to grant leniency when a defendant took responsibility for his actions. (R.R. vol. 2 p. 43). Additionally, Applicant stated that he entered his plea thinking that it would buy him more time to gather the evidence to prove his innocence. (R.R. vol. 2 p. 45).[ [13]] He further stated that he believed that he would be allowed to withdraw his plea. *Id.*

**Applicant's Admission That He Sexually Assaulted Brittny (i.e., the guilty plea)**

The record does not support a finding that applicant's guilty plea was involuntary. The record supports findings that applicant pleaded guilty as part of a strategy to get probation and that, when this

12. *See generally Ex parte Tuley,* 109 S.W.3d 388 (Tex.Cr.App.2002).

13. The cited portion of the record does not support this. This portion of the record reflects that applicant actually testified that one of the reasons he pleaded guilty was because he feared a jury would sentence him harshly if he went to trial.

failed, he attempted to withdraw his plea while pursuing a new or dual strategy of pressuring the girls to recant. This does not render applicant's guilty plea involuntary.

### Applicant's "Actual Innocence"

In *Ex parte Brown,* 205 S.W.3d 538, 545 (Tex.Cr.App.2006), this Court reiterated the heavy burden required for a convicted person to establish a post-conviction, bare claim of actual innocence.

> Establishing a bare claim of actual innocence is a Herculean task. We have stated that "any person who has once been finally convicted in a fair trial should not be permitted to wage, and we do not permit him to wage, a collateral attack on that conviction without making an exceedingly persuasive case that he is actually innocent." [Footnote omitted]. Thus, to succeed in an actual innocence claim the applicant must show "by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence." [Footnote omitted]. This showing must overcome the presumption that the conviction is valid, and it must unquestionably establish applicant's innocence. [Footnote omitted].

It is a misapplication of this Court's "actual innocence" jurisprudence to decide that no reasonable juror would convict applicant if "one [such as the convicting court] does believe Brittny's and April's recantations and their father's explanations, coupled with the medical evidence and Dr. Arambula's testimony." But, the issue is not whether a reasonable juror would convict if "one does believe" the new evidence.[14] The issue is whether a reasonable juror would convict in light of the new evidence, **when considered with the evidence of guilt that supports the conviction.** *See Brown,* 205 S.W.3d at 545; *Ex parte Elizondo,* 947 S.W.2d 202, 206 (Tex. Cr.App.1996). This is very different from making an "actual innocence" determination turn solely on whether "one does believe" the new evidence. This Court's "actual innocence" jurisprudence requires an assessment of the probable impact of the new evidence upon the persuasiveness of the State's case as a whole (not whether a reasonable juror would convict if "one does believe" the new evidence). *See id.* And, this Court, not the convicting court, is supposed to make this call. *See id.* ("our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole") and at 207 ("our job" is to "decide whether the newly discovered evidence would have convinced [a] jury of applicant's innocence").

Under a proper application of this Court's "actual innocence" jurisprudence, it is unmistakably clear that applicant has not unquestionably established his innocence. A reasonable juror could sort out the various conflicting statements made by the principals in this case (including those made by applicant himself) and still convict applicant. A reasonable juror could also reject applicant's evidence that Brittny could not have caught chlamydia from him based on Kellogg's testimony that she has never "come across another professional pediatric individual or someone involved in child abuse who accepts a blood test that

---

14. This Court's "actual innocence" jurisprudence does not state that an applicant sustains his Herculean task with new evidence that, if believed, would unquestionably establish his innocence. This would preclude any consideration of the evidence of guilt as the "actual innocence" determination would become whether the new evidence, if believed, proves innocence. This Court's "actual innocence" jurisprudence was never intended to completely ignore the evidence of guilt.

looks for antibodies of chlamydia." A reasonable juror could also find, based on Kellogg's testimony, that the scarring on Brittny's genital area was due to "chronic penetration" and was too recent to be due to any surgery at birth to correct a birth defect. A reasonable juror could also find that Brittny's recantation is not credible based on Kellogg's testimony about why children recant in cases like this (e.g., applicant's admission at the habeas hearing that he told the girls that he was going to prison because of them). Also, under applicant's factual theory at the habeas hearing, in order to acquit applicant a reasonable juror would have to believe, despite the overwhelming evidence to the contrary, that no sexual abuse of the girls occurred at all and that the prosecution went to great lengths to convict applicant even though he was innocent.[15]

In this case, applicant has not carried his Herculean task of proving his innocence because a reasonable juror could still convict him based on the overwhelming evidence of applicant's guilt even in light of Brittny's recantation and the other so-called "exculpatory" evidence.[16] I would not grant applicant relief based on, as even applicant has put it, the "circus that was put together" in this case.[17]

I respectfully dissent.

15. Applicant's claim that an imperfect initial interview of one of the children tainted the children's statements in their subsequent interviews with other professionals trained to investigate claims of child sexual abuse is not persuasive. See Brown, 205 S.W.3d at 547 (one issue "before us is the inherent persuasiveness of the evidence establishing innocence"). These professionals investigate child sexual abuse allegations using procedures and techniques designed to ascertain the truth of these allegations and not to build child molestation cases against innocent persons. The conclusions of these professionals are entitled to great weight.

16. In addition, if a jury convicted applicant after hearing the evidence presented at the habeas hearing (and also hearing that the convicting court believed the recanting witness), it is beyond question that the evidence would be legally and factually sufficient to support applicant's conviction. See generally Watson v. State, 204 S.W.3d 404 (Tex.Cr.App. 2006). In other words, a jury could reasonably find applicant guilty beyond a reasonable doubt on this evidence. See id. This Court's decision in Elizondo that a legal sufficiency standard does not apply in "actual innocence" cases was based on an improper application of the legal sufficiency standard as requiring a consideration of only the inculpatory evidence. See Elizondo, 947 S.W.2d at 205–06. This Court has very recently recognized that a proper application of a legal sufficiency standard requires a consideration of all the evidence and that this standard is "barely distinguishable" from a factual sufficiency standard under which this Court may reweigh the evidence. See Watson, 204 S.W.3d at 414–17. In granting habeas relief in cases like this, this Court is deciding that an applicant has unquestionably established his innocence with evidence that is sufficient to convince a reasonable juror beyond a reasonable doubt that applicant is guilty.

17. In addition, Brittny's and Melissa's recantations are not new. They first made written recantations on July 29, 2002, which was before applicant's sentencing hearing and his motion for new trial. Their subsequent recantations add little, if anything, that is new. The only "newly available" evidence is April's written recantation which is essentially cumulative of Brittny's and Melissa's July 29, 2002, recantations. The March 2002 blood-test results for chlamydia anti-bodies and the evidence of Brittny's operation at birth to correct a birth defect are not new either. Applicant has not presented any "newly discovered" or "newly available" evidence of innocence. See Brown, 205 S.W.3d at 545–46 (an applicant cannot rely upon evidence or facts that were available at the time of his trial,

plea, or post-trial motions, such as a motion for new trial).