

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,160

### EX PARTE DOMINGO CALDERON III, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 04-11-0244-CRA IN THE 218TH DISTRICT COURT
### ATASCOSA COUNTY

**HERVEY, J., delivered the opinion for a unanimous Court.**

**O P I N I O N**

Applicant pled no contest to indecency with a child. He claims that newly discovered evidence establishes that he is actually innocent of this offense and that he falsely pled no contest at the request of his mother.[1] We filed and set this case to determine, among other things, whether applicant has established that he is actually innocent. The State concedes and the convicting court has consistently made findings that applicant is actually innocent, and this Court has decided to

---

[1] In its May 11, 2007, findings, the convicting court found that applicant's mother testified "that she pressured [applicant] to plead" because she believed that her husband "would divorce her and seek custody of [their] children if she continued to persist in claiming [applicant's] innocence." Applicant also claimed in an affidavit that this is why he pled no contest.

accept these findings.[2]  It is necessary, however, for us to determine whether we should grant applicant habeas corpus relief and set aside his conviction because, over the course of four remands and two live hearings, the convicting court has made supported-by-the-record but contradictory findings on whether applicant's actual-innocence claim is based on newly discovered or newly available evidence.  *See Ex parte Brown*, 205 S.W.3d 538, 545 (Tex.Cr.App. 2006) ("Not only must the habeas applicant make a truly persuasive showing of innocence, he must also prove that the evidence he relies upon is 'newly discovered' or 'newly available.'  The term 'newly discovered evidence' refers to evidence that was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence.").

We first set out the facts that are not in dispute.  In November 2004, applicant was charged with aggravated sexual assault of his sister Elaine (born on May 18, 1987) and his other sister Janie (born on September 1, 1993).  On July 5, 2005, pursuant to a plea bargain, applicant pled no contest to a reduced charge of indecency involving Janie.  The convicting court deferred an adjudication of guilt and placed applicant on community supervision ("probation") for seven years.  On May 31, 2006, applicant was sentenced to ten years in prison after his probation was revoked because, among other things, he refused to admit in sex-offender therapy that he had molested Janie.  On September 29, 2006, applicant filed a habeas corpus application in which he claimed, among other things, that

---

[2]

*See Ex parte Tuley*, 109 S.W.3d 388, 395-97 (Tex.Cr.App. 2002) (granting habeas corpus relief on guilty-pleading applicant's actual-innocence claim based primarily on complainant's recantation and convicting court's findings that this recantation was credible and that the applicant's guilty plea was not "accurate") and at 393 n.2 (a person could be pressured to plead guilty to something that he did not do "in order to protect someone else, whom he loves or fears"); Article 27.02(5), TEX. CODE CRIM. PROC. (no-contest plea or plea of nolo contendere has same legal effect as a guilty plea in a criminal case).

he is actually innocent of the indecency offense involving Janie. This application was supported by Janie's July 8, 2006, affidavit recanting her prior allegations that applicant committed this offense ("Janie's July 8, 2006, recantation affidavit").[3]

The undisputed evidence also shows that in April 2005, while the aggravated-sexual-assault charges involving Elaine and Janie were pending against applicant, Elaine and Janie approached their mother ("the mother") and told her that they had falsely accused applicant of molesting them. The mother informed applicant's lawyer (Futrell) of this. After interviewing Elaine and Janie and confirming that they had recanted their allegations that applicant had molested them, Futrell set up a meeting with the prosecuting attorney (Hudson). When the mother and the girls went to Hudson's office, the mother's husband, who was Janie's father ("the father"), was also there waiting for them.

When Hudson interviewed Elaine, she again recanted, which caused Hudson to decide to dismiss the charges involving Elaine. While Elaine was meeting with Hudson, the father told Janie not to recant. When Janie met with Hudson, she did not recant, which caused Hudson to decide not to dismiss the charges involving Janie.[4] Evidence was presented at a writ hearing that the then 11-year-old Janie feared her father and was afraid that he would throw her out of the house, as he did to Elaine, if she recanted.

> Q. [APPLICANT'S COUNSEL]: Okay. Stop just a minute. So [the father], he was outside the D.A.'s office?

---

[3] This application was also supported by two affidavits (dated July 8, 2006, and July 11, 2005) from Elaine, and an affidavit (dated July 8, 2006) from the mother of applicant, Elaine and Janie.

[4] Futrell testified that he did not speak to Janie after the meeting with Hudson because "bouncing these kids back and forth between the lawyer and the D.A. and [the father] and the mother" gets them "so emotionally distraught."

A. [THE MOTHER]: Yes, he was.

Q. Did y'all jointly go into the District Attorney's Office?

A. My daughters and I walked in and he walked in.

Q. Who went in first to meet with [Hudson]?

A. It was Elaine.

Q. And then what happened after Elaine came out?

A. After she came out?

Q. Yes, what was the next thing that happened?

A. Janie went in.

Q. What was [the father's] demeanor as you were waiting? Was it in a lobby? Were you in a lobby there?

A. When Elaine was in conferring with [Hudson], Janie, myself, and [the father] were sitting out in the lobby and she didn't want to sit next to him. She wanted to sit next to me because she was afraid and she was shaking because she wanted to tell the truth and she was reluctant at that point because he was sitting there. He didn't want her to change the story. He didn't want her to. He had told her.

Q. [Applicant] is not the first child [the father] has thrown out of your home, correct?

A. No, sir.

Q. He has thrown other children out of your house?

A. Yes, sir, he threw Gabe out my number three son, and then after Elaine–after he found out that Elaine had recanted, outside of the office the D.A.'s office he told her to pack her bags and move out of the house. She was only 17.

Q. How would you describe [the father's] discipline as a parent?

A. This is my house and if you don't do what I say you need to leave.

\* \* \*

Q. [APPLICANT'S COUNSEL]: So did [the father] actually show up at the District Attorney's Office?

A. [JANIE]: Yes, sir.

Q. And how did you feel when he showed up?

A. I felt nervous and I felt scared that he was going to know that I had made it all up.

Q. Why were you scared of [the father]?

A. Because whenever he found out that [Elaine] had changed her story he kicked her out of the house and he kicked all my brothers and Elaine out of the house when they were young.

That night Janie wrote a note stating that she had lied to Hudson and that applicant was innocent.[5] That same night Janie gave her mother the note which her mother was supposed to deliver to Hudson.

Q. [APPLICANT'S COUNSEL]: Now after you left [Hudson's] office, did you prepare a letter or note some time after that?

A. [JANIE]: Yes, sir. I felt bad so I went to my room later on that night and then I called my mom in there and I said, "Mom, I told [Hudson] that he did touch me." "But I thought you were going to confess [sic]." I go, "I know, I'm sorry but I got intimidated because of [the father]. So I wrote a letter to [Hudson] saying I'm sorry that I made it up." And I don't remember what I said in the letter but I was apologizing and I gave it to my mom.

Q. Who were you writing the letter to?

A. [Hudson].

Q. And did you give the letter to your mom with intent to be delivered to [Hudson].?

A. Yes.

\* \* \*

---

[5] Janie testified that the note was not as detailed as her July 8, 2006, recantation affidavit. She testified that the note was "just a general apology" for having lied to Hudson and that the note stated that applicant "had never committed any offenses." In its March 25, 2009, findings, the convicting court found that there is "no evidence of a material difference" between Janie's note and Janie's July 8, 2006, recantation affidavit.

Q. [APPLICANT'S COUNSEL]: After you left the meeting there at the District Attorney's Office with [the father], Elaine, and Jane [sic], after that, did Janie approach you with this letter?

A. [THE MOTHER]: Yes, she was crying and she said she didn't feel–she didn't feel right that she couldn't tell [Hudson] the truth. She called me to her bedroom and that's when she told me that one night and she had a paper folded up and she said, "Could you please give this to [Hudson]." She called me into her room. She locked the door. She didn't want her father to hear it or see what she was going to give me. So she said, "You can read it and give it to him, please." And I opened it up and it said, "I'm sorry that I lied. I didn't tell the truth and I'm sorry." I don't remember the words. I don't remember what it said but it said that she was sorry and that she lied and that [applicant] was innocent.

The mother testified that soon after this she gave the note to another lawyer (Porter) to give to Hudson. The evidence is conflicting on what happened to this note after Janie's mother gave it to Porter to deliver to Hudson, and the convicting court has made contradictory findings on whether applicant, Futrell and Hudson knew about the note before applicant pled no contest in July 2005 and before his probation was revoked in May 2006.[6] The mother provided testimony that would support

---

[6]

For example, in its May 11, 2007, findings, the convicting court found that Janie's note was given to Hudson and that the mother "believed the note was made known" to Futrell and applicant.

In its January 22, 2008, findings, the convicting court found that when "applicant entered the plea in July 2005 he was unaware [that Janie] had recanted by writing a note and giving the note to [the] Mother" and that applicant "was unaware the note had been provided to [Hudson]." The convicting court also found that Porter testified that she "reviewed the note prior to delivering" it to Hudson and that Porter "did not advise Applicant or [Futrell] of the nature of the note." The convicting court also found that applicant would not have pled "had he known [that Janie] had completely recanted."

In its October 10, 2008, findings, the convicting court found that Janie did not write the note until after applicant's adjudication in May 2006 and that this note "did not come to the knowledge of the attorney for the State or any attorney for Applicant until after the adjudication of guilt."

In its March 25, 2009, findings, the convicting court found that "regardless of any consideration as to whether the State received the [note], it is clear from the testimony that: 1) [Futrell] knew that [Janie] had made statements that her allegations of sexual misconduct on behalf of his client were false; and 2) [applicant] was informed by his [and Janie's mother] that [Janie] had recanted her testimony. The Court therefore finds that the evidence of the recantation was either known to [applicant] or discoverable." We note, however, that these findings seem to be based on

a finding that applicant and Futrell knew about the note and its contents before applicant pled in July 2005. The mother, however, also provided evidence in an affidavit that she did not know if applicant and Futrell "ever saw the note from Janie." Porter testified that she delivered the note to Hudson but that she was not sure when this occurred (some of her testimony suggested that it may have occurred after applicant's probation was revoked in May 2006). Applicant, Futrell and Hudson all claimed that they did not know about the note and its contents until after applicant's probation was revoked in May 2006.[7] The whereabouts of the note are unknown, and it is a mystery as to exactly what

---

Futrell's testimony that he knew Elaine and Janie had recanted **before** the April 2005 meeting with Hudson. This testimony, therefore, would not support a finding that Futrell knew about the note or Janie's later recantation.

[7] Applicant stated in an affidavit that he did not learn that Janie "had signed an affidavit recanting the allegations" against applicant until July 2006 and that he would not have pled had he known that Janie "had completely recanted [in the note] in 2005." Futrell testified that he never saw the note and that he did not know when he first found "out about the existence of that note that was given to [Porter]" but that he believed that he found out about the note after applicant had been sentenced. Futrell testified that he would have urged applicant not to plead had he been aware of the note.

> Q. [APPLICANT'S COUNSEL]: Had you known the [sic] presence of this note, would your advice have been different to [applicant] concerning application for deferred?
>
> A. [FUTRELL]: I'm confident that I would have strongly urged him not to plead. I mean, I'm confident that I would have been able to continue the case and get with the district attorney and talk and develop this other recantation, which if nothing else corroborated the other one. I mean they sort of worked to support each other, the other corroborating statement, and in addition to the other things that I had come to know and understand about his family, I think it would have been–I think it would have been worth trying if we couldn't have gotten it dismissed, yes, sir.

Hudson testified that he recalled Porter mentioning something to him about the note but that he did not recall her physically handing it to him. He also testified that he was "almost positive" that Porter made him aware of the note "after [applicant's] deferred was revoked." Hudson stated in an affidavit that:

happened to the note.

Futrell and Hudson also provided testimony on the circumstances leading up to applicant's no-contest plea to the indecency offense involving Janie. Neither one mentioned having any knowledge of the note and its contents while they were negotiating the plea.

> [FUTRELL]: I had understood that both of the girls were going to recant. When [Elaine] did and that was dismissed and okay, fine, but [Janie] didn't. The facts were pretty damming [sic] and from my experience and talking with people and trying to figure out what had happened, I thought that the best thing for [applicant] would be to be placed on a deferred adjudication probation. My experience in this district has been that with sex offenses involving children punishment ranges can get to be pretty severe and with the facts that were alleged and in the discovery as I recall, it wasn't pleasant. They weren't pleasant and so I mean, we decided in the big scheme of things, that would be the best thing to do. So we did. Now had I known of the–I understand that [Janie] in April gave an affidavit to [Porter] recanting.
>
> * * *
>
> With the dismissal of [Elaine's] count, there were some similar language and similar alleged conduct in both counts and I think we can–and I'm not sure if [Hudson] will agree with this or not, but with the first count dismissed and the affidavit and the statement of [Elaine] saying, "that didn't happen, I was pushed and goated [sic] and talked into it," that could have been some impeaching evidence at the trial on a first degree felony on the second count because it was–they were similar enough in the factual allegations, that with one of them recanted and the other one still out there but sort of equivocating somewhat, I think it gave me some basis to say I think I can impeach part of the more critical stuff that you're talking about or I think I can

---

> Only after [applicant's probation was revoked and he] was sentenced did [Janie] come forward and advise [Porter] of a recant. I advised [Porter] that information needed to be provided to [Futrell], [applicant's] counsel in the previous case. [Porter] stated she had a letter written by the mother of [Janie] outlining a new recant. I instructed her this letter needed to be given to [Futrell]. Both [Porter] and [Hudson] communicated this information to the District Judge, Donna S. Rayes, and prior counsel for the defense, [Futrell].
>
> The recant by [Janie] was not made prior to the plea of no contest by [applicant]. [Janie's] recant was not made prior to his adjudication of guilt and subsequent sentencing to TDC. The recant [sic] by [Janie] was only brought to the attention of both defense attorney and the State after [applicant] was sentenced to TDC.

(Emphasis in original).

impeach this part of the factual allegation with what the sister has recanted about and what the sister has said about these things and so we worked. We got in a circumstance where both of us had a risk of going to trial, I think, and I didn't want him to go–I mean, this was–I remember having a constructive relationship with [applicant] and I didn't want him to go to prison for a long or big number but here's this little girl that's going to testify and she had some pretty unpleasant things to say and that was a risk if we had gone to trial. At the same time [Hudson's] already let one of them go and there's some few things in the remaining one that were I think would have given him some pause. So it was a compromise between everybody. I talked with the mother, I talked with [applicant], [Hudson]. It wasn't Futrell saying, you better do this here, sign, and let's go. I think it was a combined effort, a collaborative effort. Certainly if that's not the way the rest of them remembering it happening, they can say so, but I think it was collaborative. We talked about it. We weren't happy with it. I don't think anybody was happy with it. But such the [sic] feelings of a good settlement sometimes.

* * *

[HUDSON]: The reason it's an indecency case is because [Futrell] and I argued repeatedly on the registration and we knocked it down to indecency by exposure because the registration period for those crimes is less than lifetime registration. I think it's ten years from the date you're finished with probation or something and that's why it's an exposure case but I met with Janie all by herself and Janie told me what happened, you know. He did touch me here. That's why I kept the case. If she had said no, then I would have–I mean, I'm not going to maintain a case if the girl tells me nothing happened and continues to tell me that.

We further note that applicant argued to the convicting court that it would be "rather amazing" that "everybody [would be] going forward with the plea" if they knew about Janie's note and its contents.

[APPLICANT'S COUNSEL]: I think the Court is also aware of the great trials that this family has gone through today to come and tell the Court what happened, how this has gone on for this period of time. With all these, [the father] in the background trying to intimidate everyone. Throwing them out of their house. That is why [Janie] was afraid to go to the District Attorney that day when he showed up and made his presence known. She had already seen [applicant] and other relatives thrown out of the house by him. She was terrified of this man. But it was that night when she felt those pangs of guilt again and she wrote this letter that was delivered here to the District Attorney's Office and by all count [sic], apparently this is a recantation letter and yet, I don't know if [Futrell] knew that was a complete recantation but if he did, it's rather amazing that the District Attorney and the defense counsel would have a letter for them from a complaining witness saying, "I'm recanting, nothing

happened," and then everybody going forward with the plea.

In deciding whether Janie's July 8, 2006, recantation affidavit is "newly discovered evidence," we believe that the issue is whether applicant knew of or could have discovered, before his no-contest plea in July 2005 or before his probation was revoked in May 2006, Janie's April 2005 note since this note and its contents and Janie's July 8, 2006, recantation affidavit are essentially the same. *See Brown*, 205 S.W.3d at 545 ("newly discovered evidence" is "evidence that was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence," and an applicant "cannot rely upon evidence or facts that were available at the time of his trial, plea, or post-trial motions, such as a motion for new trial"). In addition, it is not dispositive that Futrell and applicant knew that Janie had recanted to her mother and to Futrell before the April 2005 meeting with Hudson, since Janie reaffirmed her accusations against applicant during the April 2005 meeting with Hudson thus putting her in the same position she was in when she first accused applicant of molesting her.

On this record, we decide that Janie's note and its contents were unknown to applicant when he pled in July 2005 and when his probation was revoked in May 2006. We adopt the convicting court's findings that support this decision and disregard those findings that do not support this decision. *See Ex parte Reed*, 271 S.W.3d 698, 727-28 (Tex.Cr.App. 2008). In addition, we further note that, under the specific facts of this case, it seems highly unlikely that applicant and the State would negotiate a plea with knowledge of Janie's note and its contents, particularly since the State had already agreed to dismiss the charges involving Elaine based on her recantation.

And, even if Janie's note and its contents were known to Futrell and applicant or could have been discovered by them through the exercise of due diligence, we would further question whether

this evidence would have been "available" to applicant to establish a claim of actual innocence when he pled and when his probation was revoked given the father's influence over Janie and his pressuring Janie not to recant.[8] *See Brown*, 205 S.W.3d at 545-47 (an applicant must prove that the evidence he relies upon is "newly discovered" or "newly available"). We believe that these circumstances would have made Janie's note and its contents just as "unavailable" to the applicant in this case as the daughters' recantations were "unavailable" to the applicant in *Zapata* in which the applicant was unable to produce the testimony of his recanting daughters at his sentencing hearing because the mother failed to produce these daughters for the hearing. *See Ex parte Zapata*, 235 S.W.3d 794, 795 (Tex.Cr.App. 2007) (applicant learned of daughters' recantations "after the entry of the plea but before sentencing" and he "was unable to produce the recantation testimony of his daughters [at the sentencing hearing] through no fault of his own"). We decide that Janie's July 8, 2006, recantation affidavit is "newly discovered" and "newly available" evidence. *See Brown*, 205 S.W.3d at 545.

Habeas corpus relief is granted. The judgment in cause number 04-11-0244-CRA in the 218th District Court of Atascosa County is set aside, and applicant is remanded to the custody of the Sheriff of Atascosa County to answer the charges against him. Copies of this opinion shall be sent to the Texas Department of Criminal Justice–Correctional Institutions Division and Pardons and Paroles Division.

---

[8] In its January 22, 2008, findings, the convicting court found that "[Janie] was not under the influence of [the father] when she gave the recanting affidavit in July of 2006 nor was she in custody of [the father] when she willingly testified at the writ hearing on April 9, 2007."

Hervey, J.

Delivered: April 28, 2010
Publish