02-10-200-CR PDR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO.  02-10-00200-CR

 

 


 
 
 Ex Parte James Oliver Mello III
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

 

FROM Criminal
District Court No. 3 OF Tarrant COUNTY

----------

 

OPINION
ON PETITION FOR DISCRETIONARY REVIEW

----------

 

I.
Introduction

          Pursuant
to former rule of appellate procedure 50, we withdraw our June 30, 2011 opinion
and judgment and substitute the following.[1]  See Order
Amending Texas Rules of Appellate Procedure, 74 Tex. B.J. 763 (Tex. Crim. App.
effective Sept. 1, 2011). 

James
Oliver Mello III appeals from the denial of his article 11.072 post-conviction
application for writ of habeas corpus.  In one point, Mello challenges the habeas
court’s conclusion (and supporting findings) that Mello failed to prove he is
actually innocent.  Because the habeas court did not abuse its discretion in
denying habeas relief, we affirm. 

II.
Procedural Background

On
September 23, 1994, Mello pleaded guilty pursuant to a plea agreement to the
second-degree felony offense of indecency with a child by contact.  See
Act of June 19, 1987, 70th Leg., R.S., ch. 1028, ' 1,
1984 Tex. Gen. Laws 3473, 3473 (amended 2009) (current version at Tex. Penal
Code Ann. ' 21.11 (West 2011)).  In accordance with
the agreement, the trial court deferred a finding of guilt and placed Mello on
community supervision for three years (and subsequently added an additional
year).  Mello was released from community supervision on November 19, 1998.  Mello
did not appeal or otherwise challenge the granting of deferred adjudication
until filing his June 15, 2009 application for writ of habeas corpus pursuant
to article 11.072 of the code of criminal procedure.[2] 
See Tex. Code Crim. Proc. Ann. art. 11.072 (West 2005).  

In
his article 11.072 habeas application, Mello asserted that newly discovered
evidence established that he was actually innocent of the indecency with a
child offense for which he was placed on deferred adjudication community
supervision.[3]  The State filed a
response in opposition.  On January 22, 2010, the judge presiding over the
habeas proceeding (“habeas court”) held an evidentiary hearing.[4] 
After both sides filed proposed findings and conclusions, the
habeas court entered findings of fact and conclusions of law and denied Mello’s
request for relief on May 19, 2010.

III. Analysis

In
one point, Mello asserts that the habeas court abused its discretion by denying
his post-conviction habeas application.[5]

A.  Applicable
Law 

1. 
Actual Innocence 

Mello
raises a “Herrera claim”[6]—e.g., “a substantive
claim in which the person asserts a ‘bare claim of innocence’ based solely on
newly discovered evidence.”[7]  Ex parte Brown,
205 S.W.3d 538, 544 (Tex. Crim. App. 2006).  Claims of actual innocence based
on newly discovered evidence are cognizable on post-conviction writs of habeas
corpus.[8]  Ex parte Brown,
205 S.W.3d at 544 (citing Ex parte Elizondo, 947 S.W.2d 202, 205 (Tex.
Crim. App. 1996)).  An applicant who pleaded guilty can later bring an actual innocence
claim based on newly discovered evidence.[9]  Ex parte Brown,
205 S.W.3d at 544 (citing Ex parte Tuley, 109 S.W.3d 388, 393–96 (Tex.
Crim. App. 2002)).  “Establishing a bare claim of actual innocence is a
Herculean task.”  Ex parte Brown, 205 S.W.3d at 545.

In
reviewing a Herrera claim, the habeas court must first consider whether
the applicant presented newly discovered evidence that affirmatively
establishes his innocence.  Ex parte Franklin, 72 S.W.3d at 678; see Ex
parte Calderon, 309 S.W.3d 64, 65 (Tex. Crim. App. 2010); Ex parte Brown,
205 S.W.3d at 546.  If the applicant presents such evidence, the habeas court
then determines whether the applicant proved by clear and convincing evidence
that no reasonable juror would have convicted him in light of the newly
discovered evidence.[10]  Ex parte Brown,
205 S.W.3d at 544; Ex parte Franklin, 72 S.W.3d at 678.  The habeas
court must examine the “newly discovered evidence” and determine whether the
“new” evidence, when balanced against the “old” inculpatory evidence,
unquestionably establishes the applicant’s innocence.  Ex parte Thompson,
153 S.W.3d 416, 417 (Tex. Crim. App. 2005).  The habeas court does not review
the fact finder’s verdict but instead decides whether the newly discovered
evidence would have convinced the fact finder of the applicant’s innocence.  Ex
parte Elizondo, 947 S.W.2d at 207, 209; see Ex parte Thompson, 153
S.W.3d at 427–28 (Cochran, J., concurring).  If the applicant entered a guilty
plea, the guilty plea—along with any evidence entered, or stipulation to the
evidence, supporting the plea—must be considered in weighing the old evidence
against the new evidence.  Ex parte Tuley, 109 S.W.3d at 392 (“A
convicting court is not free to ignore a guilty plea when reviewing a
collateral attack.”).  Courts should “give great respect to knowing, voluntary,
and intelligent pleas of guilty.”  Id. at 391.

2. 
Standard of Review

While
we look to the court of criminal appeals’s opinions in article 11.07 habeas
cases for some guidance in addressing this issue, we consider that the higher
court has noted “at least one significant distinction” between the posture of
article 11.07 and article 11.072 habeas cases.  See Ex parte Garcia, No.
PD-1658-10, 2011 WL 4436554, at *2 (Tex. Crim. App. Sept. 14, 2011).  In Garcia,
the court of criminal appeals explained that,

In article 11.07
habeas cases, this Court is the ultimate finder of fact; the trial court’s
findings are not automatically binding upon us, although we usually accept them
if they are supported by the record.  In an article 11.072 habeas case,
however, the trial judge is the sole finder of fact.  There is less leeway in
an article 11.072 context to disregard the findings of a trial court.  Because
the court of appeals and this Court are truly appellate courts in the article
11.072 context, it makes sense as a matter of logic that the Guzman [v.
State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)] standard would control.

 

Id.
(citations omitted).  

Thus,
absent an abuse of discretion, we must affirm a habeas court’s decision on
whether to grant the relief requested in a habeas corpus application.  See
Garcia, 2011 WL 4436554, at *2; see also Kniatt v. State, 206
S.W.3d 657, 664 (Tex. Crim. App.), cert. denied, 549 U.S. 1052 (2006); Ex
parte Karlson, 282 S.W.3d 118, 127 (Tex. App.—Fort Worth 2009, pet. ref’d);
Ex parte Twine, 111 S.W.3d 664, 665 (Tex. App.—Fort Worth 2003, pet.
ref’d).  We review the evidence in the light most favorable to the habeas
court’s ruling.  Kniatt, 206 S.W.3d at 664.  In conducting our review,
we afford great deference to the habeas court’s findings of fact and
conclusions of law that are supported by the record.  Ex parte Karlson,
282 S.W.3d at 127–28.  This deferential review applies even when the
findings are based on affidavits rather than live testimony.  Ex parte
Wheeler, 203 S.W.3d 317, 325–26 (Tex. Crim. App. 2006).  We also afford
great deference to the habeas court’s application of the law to the facts, to
the extent that the resolution of the ultimate question turns on an evaluation
of credibility and demeanor.  Ex parte Peterson, 117 S.W.3d 804,
819 (Tex. Crim. App. 2003), overruled in part on other grounds by Ex parte
Lewis, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007).  If the resolution of
the ultimate question turns on an application of legal standards, we review the
determination de novo.  Id

B. 
Applicable Facts

In
the early 1990s, the State began investigating the alleged sexual abuse of
J.A.L. (a child younger than 17 years of age) and her siblings, J.H.L. (J.H.)
and J.E.L. (J.E.), by various individuals, including their parents, Joseph and
Wanda L.  During the investigation, J.A.L. and J.H. told law enforcement
officials that “Jimmy” had sexually abused J.A.L.  The State charged the
parents, Mello, Donald Tomlin, and Frank Montgomery with varying degrees of
sexual offenses.  The parents were tried and sentenced to lengthy prison
sentences.  Tomlin and Montgomery both entered guilty pleas and were sentenced
to prison terms, which they have served.

1. 
Mello’s Original Plea

In
September 1994, Mello pleaded guilty to committing indecency with a child by
contact against J.A.L. on or about September 1, 1990.[11] 
The docket sheet provides that “[a]fter hearing the evidence, the Court found
that the evidence substantiate[d] the defendant’s guilt” but that the
assessment of punishment would be deferred for three years.  While the habeas
record does not specifically delineate the evidence introduced at Mello’s 1994
plea hearing, the habeas court, without objection, took judicial notice of and
considered the following documents from the investigation of this case
(attached to the State’s habeas response). 

a.  1993 Investigative Report

One
such document was a May 6, 1993 investigative report: 

When our office
joined in the investigation of the [L.] family in [the] summer [of] 1992[,] we
obtained the identities of each Donnie, Eddie, Jimmy, and others, who had
worked at the Dairy Queen[] where [J.A.L.’s mother and father] had worked. 
D[river’s] L[icense] photos were obtained and placed in a group of sixteen
photos.  [An investigator] interviewed [J.H.] and his foster mom.  Among those
[J.H.] [identified] was defendant James Mello.  [J.H.’s] younger sister, victim
[J.A.L.], identified the photo of Jimmy Jacobs, who was another Jimmy who had
worked with their parents.  The photos of Mello, Tomlin, and others were very
poor quality.  Jacobs denied ever being in the [L.] family home but did work at
the Southlake D.Q. where the [L.] children visited often.  [Portion of
statement redacted here.] 

 

James Mello was also
identified as being an accomplice in these crimes by other Defendants (Donald
Tomlin & Frank Edward Montgomery).  Mello also admitted being in the [L.]
home many times.  [Portion of statement redacted here.]

 

The case against
Mello was just recently finalized and he was just recently arrested, and a mug
shot photo taken is of much better quality than the D.L. photo.  This mug shot
was taken on 4-29-93, or approximately two and one half years after . . . “Jimmy”
violated the children.  

 

On 5-06-93 I took a
six photo lineup of mugshots of white males to [J.A.L.’s] foster residence. 
Mello was one of the six.  [J.A.L.] viewed it for about five minutes and was
unable to make a positive ID of the Jimmy who abused her, but she did point out
two photos stating that he could be one of the two.  One of the photos was
Mello.  On a photo copy of the lineup she circled them and signed it.  Foster
mom Freeman also signed as a witness.

 

b.  Frank Montgomery’s 1993 Sworn
Statement

          In
his March 1993 sworn statement, Frank Montgomery stated that the State charged
him with the sexual assault of J.A.L.; that in 1990 he worked at the Southlake
Dairy Queen where Joe L. was the manager; that he rented a room in a shack
behind the L.’s house for three or four months; that Wanda and Joe L. had four
children, including J.A.L. and J.H.; that he engaged in sexual acts with J.A.L.
and J.H.; that while living in the shack, he would look in the windows of the
house; and that he witnessed several sexual assaults on the children.  Montgomery
further stated,

A young guy who
worked [at the Dairy Queen], who I was referring to as Donnie earlier, came to
the [L.’s] often.  I have looked at photos and I have identified a photo as
being the guy that I have been calling Donnie and I wrote on the back of it
that I had seen [J.A.L. performing sex acts on him].  I have been told his name
is Jimmy.  The name Donnie has been mentioned to me ever since I was first
arrested but the photo I have been told is Donnie is not who I have been
referring to as Donnie. . . . I saw Jimmy fondling [J.A.L.] or touching her
private area.

 

The
picture Montgomery identified was a driver’s license photograph of Mello.  Montgomery
also stated that he agreed “to testify against the others involved” and that he
expected leniency in his case.[12]

c.  Donald Tomlin’s 1993 Sworn
Statement and Plea
Admonishment

 

In
his February 1993 sworn statement, Donald Tomlin stated that he understood he
was “facing criminal charges for involvement with the [L.] kids,” that he
worked at the Dairy Queen with Joseph L., that he had been to the L. home on
several occasions (where he observed the parents sexually abusing the
children), and that nine– or ten–year old J.A.L. and seven– or eight–year old
J.E. performed oral sex on him three or four times each.  Tomlin further stated
that “Jimmy Mello is a friend of mine who worked at the Dairy Queen and also
went to [the L.] house”; that he and Jimmy talked about “the girls” and that
“Jimmy said that he had had oral sex, or a term meaning the same thing with
them.”  Tomlin stated that Jimmy was in the photograph he identified and signed
that day.

In
May 1993, Tomlin signed written plea admonishments and agreed that he would

testify truthfully
against co-defendants—Joseph Lee [L.], Wanda [L.], Frank Edward Montgomery,
James Mello, and any other person charged with sexual offenses committed
against the [L.] children of which this def. has knowledge & adopt prior
testimony as truthful given in Jan. 1993.

 

2.  Newly-Tendered
Habeas Evidence 

At
the January 2010 habeas hearing, the habeas court took judicial notice of the
affidavits, documents, and photographs attached to the parties’ habeas
pleadings.

a.  Mello’s Documentary Evidence 

(1) 
J.A.L.’s June 2009 Affidavit

In
her June 3, 2009 affidavit, J.A.L. states that her parents and “several other
men” including a man named “Jimmy” committed sexual offenses against her and
her siblings.  She states that an attorney for Mello, Gary Udashen, “has shown me
a picture of James Mello from the mid-1990’s” and that “[t]he person in the picture
. . . is not the Jimmy that was involved in this and he had nothing to do with
the offense against me.”  J.A.L. recounts that Udashen asked her to “write that
down” and that she wrote on the back of the picture the following:

This is certainly
(100%) not the man who should be registered for hurting me.  I have never seen
him before.  Jimmy was a bigger man with darker hair.  I remember him very
well.

 

The
photograph was attached to the affidavit.

(2)  Frank Montgomery’s May 2009 Affidavit

In
his May 4, 2009 affidavit, Frank Montgomery states that he pleaded guilty to
indecency with a child in Tarrant County, Texas in 1993 and that he testified
against Joe L. in 1994 and implicated “Jimmy.”  Montgomery indicates that more
recently a private investigator named Jay Matthews sent him a picture and asked
if he knew the person in the photograph.  Montgomery states, “I do not
recognize the person in this picture and I do not know this person.”  He also
states that he was not referring to the person in the picture when he testified
at Joe L.’s trial.  The picture is signed and attached to his affidavit, and it
is the same photograph that Udashen showed J.A.L. in 2009.

(3) Donald Tomlin’s April
2009 Affidavit

          In
his April 26, 2009 affidavit, Donald Tomlin states he was convicted in Tarrant
County of a sexual offense involving a child of Joseph and Wanda L.  He also
states, 

          I know
James Mello and I knew him during the time period that the allegations against
me and the [L.’s] and others arose.  During the entire time I knew James Mello,
he never went by Jimmy.  Rather, he was always known as James.  If someone
during that time period referred to a person named Jimmy they would not be
referring to James Mello. . . .

 

          There was a
person named Jimmy that worked at the Dairy Queen but I do not remember his
last name.  The Jimmy who worked at the Dairy Queen was not James Mello.

          

          I do not
believe that James Mello ever had any type of sexual contact or activity with
any of the [L.] children.  I have never told anybody that he did and I never
told anybody that I was going to testify that he did.

 

Mello
also tendered a second affidavit from Tomlin which states that he reviewed his
1993 statement and that he did not

recall saying this
about Mr. Mello.  If I did, it was because I was willing to say anything to try
to stay out of prison and I was told by law enforcement that Mr. Mello was
involved and they had him.  The statement that Mr. Mello is alleged to have
said to me is not accurate.

 

. . . .

 

I do not think James
Mello did anything to the [L.] children and I do not think he is the type of
person who would do something to them. 

 

(4)  Friends and Relatives’ Affidavits

Mello
submitted seven affidavits signed in 2009 stating, in essence, that Mello has
always been known as “James,” not “Jim” or “Jimmy.”[13] 
Mello also tendered a November 2009 affidavit from Wanda L., in which she
states that “Jim (James Mello) was hardly ever at our home in Southlake, Tx.
and on the rare occasion that he was there he never had an opportunity to be
alone with my children ([J.A.L.]).”[14]

b.  State’s Habeas Evidence

(1) 
Documents Referring to Mello as “Jim” or “Jimmy”

 

In
its habeas response, the State tendered Tomlin’s 1993 affidavit in which he
referred to “Jimmy Mello” as a friend who worked at the Dairy Queen who also
sexually assaulted J.A.L.  Additionally, the State submitted Mello’s 1990 Dairy
Queen employment application in which he listed his name as “Jim O. Mello
III.”  The State also submitted photocopied pages from Mello’s 1986 school
annual where he was listed as “Jim Mello.”

(2)  J.A.L.’s July 2009 Affidavit

In a
July 15, 2009 affidavit, J.A.L. recounts the circumstances surrounding her June
2009 affidavit.  J.A.L. explains that Mello’s habeas counsel “told [her] that
they believed that James Mello was not the same ‘Jimmy’ that we knew several
years ago”; that Mello never went by the name Jimmy and had never worked at
Dairy Queen; and that the wrong person had been sent to jail.  Later, habeas
counsel came to her house and showed her “a picture of a guy” and “led [her] to
believe that the picture [she] was looking at was a photo of ‘[J]ames’ from
back then.”  J.A.L. recounts her statement to habeas counsel that the picture
did not look like the Jimmy she remembered.  J.A.L. states that “the guy called
Jimmy had darker hair and darker skin” than the picture habeas counsel showed
her.

(3)  J.H.’s July 2009
Affidavit

In a
July 14, 2009 affidavit, J.H. states that he received a 2009 package from a
Dallas attorney containing materials from this case, including a picture.  J.H.
recounts that the attorney subsequently called him on the telephone and asked
him if the person in the photograph was James Mello.  According to J.H., he
told the attorney that he was “about 50 – 50 percent” sure that it was not. 
Although J.H. initially agreed to sign an affidavit to this effect, he
ultimately decided against it.  J.H. further explains that, afterward,
investigator Kathy Manning with the Tarrant County District Attorney’s Office
contacted him and showed him the same picture that had been mailed to him. 
J.H. explains that that picture

looks like what I
remember James Mello to look like by the smile, but I am only 50 percent sure. 
Investigator Manning showed me an old picture of a very much younger version of
the same person.  By looking at both of the pictures at the same time I am 100
percent sure that they are the same person that I knew to be “Jimmy.”

 

c.  Live Testimony

          At
the habeas hearing, Mello called J.A.L., and the State called J.H.

(1)  J.A.L.’s
Testimony

On
direct examination, Mello’s habeas counsel showed J.A.L. the picture he had
presented to her in 2009—an 8 x 10 colored professional-looking headshot of
Mello in a blue sweater with a bright blue background (Photo A).[15] 
J.A.L. testified (consistent with her June 2009 affidavit) that she did not
recognize the person in Photo A.  Habeas counsel then showed J.A.L. three
additional photographs of Mello, including (1) a color photograph of Mello
(similar to a yearbook photo) wearing a “bright blue-and-white patterned shirt”[16]
(Photo B); (2) a color snapshot of Mello sitting at a dining room table dated
December 1990 (Photo C); and (3) a black and white copy of Mello’s driver’s
license picture estimated to have been taken in 1992 (Photo D).[17]

J.A.L.
testified that she recognized the person in Photos B and C (and to a lesser
extent the person in Photo D) from the time of the offense.  She testified that
the person depicted in Photos B, C, and D looked different to her than the
person depicted in Photo A.  When asked if the person she recognized in Photos
B, C, and D was “one of the people who did something” to her, J.A.L. responded,
“I don’t remember.”  She explained, however, that she remembered him “being at
[her] house.”  When asked if she remembered the people who “did these things to
her,” she stated that she did not “recall the situations.”  She agreed with
habeas counsel that she did not “remember the specifics of it.”

On
cross-examination, J.A.L. testified that the person in Photo A looked “a lot
more, I guess, Irish, you would say, has red hair, has a more paler, a red tint
to his skin.”  She further explained that the person in Photo C “has more of a
like tan skin with dark curly hair” and that, in comparing it with Photo A, “[t]hey
just look like different people to me.”  She reiterated that the person in
Photo C was “definitely” more like what she remembered “Jimmy” looking like at
that time.

(2)  J.H.’s Testimony

J.H.
testified for the State that he recognized the person in the photograph mailed
to him in 2009 as “the guy we called Jimmy.”  J.H. also identified Mello in
open court.  When asked how he recognized Mello, J.H. stated, “I—just the
smile—not the smile.  The cheeks, the lips, you know.  Just his mouth area,
really.”  When asked how he knew Jimmy, J.H. stated that Jimmy had been at his
house and thrown him off the balcony when he (J.H.) had been around nine years
old.  He further explained that Jimmy, Donnie, and Eddie would come to their
Southlake house about once a week “to party” and that no one else named Jimmy
came to the house.  J.H. stated that he did not always see the three men
because they would not always come upstairs, where he was locked up in his
room.  He also stated that he never saw Jimmy sexually assault J.A.L.

C. 
The Habeas Court’s Findings, Conclusions, and Judgment

          On
May 10, 2010, the habeas court made findings of fact and conclusions of law and
denied Mello’s habeas application.  In addition to summarizing J.A.L.’s
statements and finding her testimony credible, the habeas court found that
J.A.L.’s “inability to recognize Applicant from the blue background photograph
[Photo A] [was] not affirmative evidence of innocence” due to “the amount of
time that has lapsed; the visual differences in coloring, tint, and build of
Applicant between the blue background photograph [Photo A] and the dining room
table photograph [Photo C]; and the confirmation that the dining room table
photograph was taken near the time of the offense.”  In addition to making
several additional findings, the habeas court 

! found that Frank
Montgomery’s 1993 affidavit was “more accurate” than his 2009 affidavit (which
the court found to be “not credible”) due to the amount of time that had
elapsed and the visual differences between Photo A and Photo C;  

 

!  listed—but did not
make a credibility finding regarding—Donald Tomlin’s sworn statements and
signed written plea agreement; 

 

!  found J.H.’s
testimony to be credible; and   

 

!  found “that there
is evidence that Applicant was the person referred to as ‘Jimmy’ by both the
children and co-defendants in this case.” 

          The
habeas court concluded that Mello (1) failed to present affirmative evidence
that he is innocent; (2) failed to present newly discovered evidence that is
affirmative evidence of innocence; (3) failed to prove by clear and convincing
evidence that no reasonable juror would have convicted him in light of J.A.L.’s
affidavit; and (4) failed to prove that he is actually innocent.  

D. 
Mello’s Challenges on Appeal

On
appeal, Mello challenges the habeas court’s conclusions (and underlying
findings) that J.A.L.’s testimony and Montgomery’s 2009 affidavit did not
affirmatively establish his innocence.  Mello also challenges the habeas
court’s finding that there is evidence that Mello was the person referred to by
J.A.L., J.H., and Mello’s co-defendants as “Jimmy.”   

Mello
challenges the habeas court’s conclusion as to J.A.L. because (1) J.A.L.
“looked at a picture of Mello [Photo A ] and said that she is 100% sure that he
is not the person who did these things to her,” and (2) she “has never said
that Mello is the person who committed the offense and her statement that he is
not has not been contradicted.”  Mello omits several significant facts. 
Although Mello bears the burden of persuasion, Photo A is not dated.  The
indictment asserts that the offense occurred on or about September 1, 1990. 
The only evidence Mello presented as to when Photo A was taken is J.A.L.’s
statement in her June 2009 affidavit that “Mr. Udashen has shown me a picture
of James Mello from the mid-1990’s.”  There is no corroborating evidence that
this time frame is accurate.  Thus, Mello presented no affirmative evidence
that Photo A was taken at or near the time of the offense, or more importantly,
that Photo A reflects Mello’s appearance at the time of the offense.  In fact,
J.A.L.’s testimony supports the habeas court’s finding that J.A.L.’s “inability
to recognize [Mello] from the [Photo A] is not affirmative evidence of
innocence.”  J.A.L. recognized the “‘Jimmy’ who went to her house” in Photos B
and C, and the State established that these photographs were taken before Mello
pleaded guilty.  J.A.L. “definitely” recognized “Jimmy” in Photo C—in which he
is shown sitting at a dining room table in December 1990—as how he looked
around the time of the offense.  J.A.L. specifically testified that the person
depicted in Photos B, C, and D looked different to her than the person depicted
in Photo A.  

Also,
J.A.L.’s testimony that she did not recall whether the “Jimmy” in Photos B and
C “did something” to her is not a recantation.  J.A.L. was eight years old at
the time of the 1990 offenses, and she was unable in 1994 to affirmatively
identify Mello as one of the men who sexually abused her.  At the habeas hearing
sixteen years later, J.A.L. testified to “Jimmy” being at their house “back
during that time period.”  Based on the trauma J.A.L. underwent, it is
understandable that she would not remember “the specifics of it.”  Thus, the
record supports the habeas court’s finding that J.A.L.’s inability to recognize
Mello in Photo A is not affirmative evidence of innocence.  The record also
supports the habeas court’s conclusion that J.A.L.’s June 2009 affidavit and
her 2010 testimony are not affirmative evidence of Mello’s innocence.  

Further,
the record supports the habeas court’s findings that Montgomery’s 2009
affidavit is not credible and that his 1993 affidavit is more accurate; it also
supports the habeas court’s conclusion that Montgomery’s 2009 affidavit is not
affirmative evidence of Mello’s innocence.  As previously discussed, Mello
failed to establish that Photo A reflects Mello’s appearance at the time of the
offense.

          Regarding
Tomlin’s recent affidavits, Mello notes without argument that the trial court
“simply summarized” Tomlin’s several statements “without drawing any real
conclusions.”  Although the trial court did not make explicit conclusions as to
Tomlin’s 1993, 2009, and 2010 statements, the habeas judge stated at the
hearing that he was “quite skeptical of the weight” he might give to Tomlin’s
statements and that he was not sure that the statements were “going to count
for much.”[18]  Notably, Mello himself advocated
the following finding in his proposed findings of fact and conclusions of law:
“The statements from Tomlin are contradictory and inconsistent.  The Court
finds that the statements from Tomlin are entitled to no weight and will form
no part of the Court’s decision in this case.”  It appears that the habeas
court adopted this finding without explicitly stating so.  We conclude that the
habeas court’s findings and conclusions adequately resolve Mello’s actual
innocence claim and that the record supports the habeas court’s conclusion that
Mello failed to present newly discovered evidence that is affirmative evidence
of innocence.

          When
an applicant asserts a Herrera-type claim based on newly discovered
evidence, the evidence presented must constitute affirmative evidence of the
applicant’s innocence.  Ex parte Franklin, 72 S.W.3d at 678.  “Once the
applicant provides such evidence, it is then appropriate to proceed with a
determination of whether the applicant can prove by clear and convincing
evidence that no reasonable juror would have convicted him in light of the
newly discovered evidence.”  Id.  Thus, in this case, the habeas court’s
analysis was complete when it concluded that Mello failed to provide
affirmative evidence of his innocence.  Id.; see Ex parte Thompson,
153 S.W.3d at 427 (Cochran, J., concurring) (explaining that “[o]nly if the
trial court finds that the new evidence is both credible and, by clear and
convincing evidence, that evidence, by itself unquestionably establishes the
applicant’s innocence, should the trial court continue” by evaluating the
probable impact of the newly available evidence upon the persuasiveness of the
State’s case as a whole and in light of the previous proceeding).  Although the
habeas court concluded that Mello failed to affirmatively prove his innocence,
it continued its analysis and further concluded that Mello “failed to prove by
clear and convincing evidence that no reasonable juror would have convicted him
in light of [J.A.L.’s] affidavit.”  Mello’s remaining challenges focus on this
conclusion.

For
instance, Mello takes issue with the habeas court’s finding that “there is
evidence that [Mello] was the person who is referred to a[s] ‘Jimmy’ by both
the children and co-defendants in this case.”  Specifically, Mello challenges
the habeas court’s finding that Montgomery saw Mello sexually assault J.A.L.,
asserting that the habeas court did not address “the fact that Montgomery was
confused as to whether he saw Donnie or Jimmy commit the offense.”  Mello also
maintains that the habeas court failed to consider that J.H. did not see who
sexually abused J.A.L. so “his testimony is not evidence of Mello’s guilt.”  In
addition to Mello’s factual assertions not being supported by the record,[19]
the habeas court does not review the fact finder’s verdict but instead decides
whether the newly discovered evidence would have convinced the fact finder of
the applicant’s innocence.  See Ex parte Elizondo, 947 S.W.2d at 207,
209.  The habeas court must assess whether the “new” evidence satisfactorily
rebuts or nullifies all of the State’s primary inculpatory evidence from the
“old” trial.  Ex parte Thompson, 153 S.W.3d at 428.

As
previously discussed, the record supports the habeas court’s conclusion that
Mello failed to present affirmative evidence of his innocence.  Additionally,
the record supports the habeas court’s finding that there was evidence that
Mello was “Jimmy.”  In addition to the evidence set out above, Mello pleaded
guilty to committing indecency with a child by contact.[20] 
See Ex parte Tuley, 109 S.W.3d at 392 (“A convicting court is not
free to ignore a guilty plea when reviewing a collateral attack.”), 393
(“Convictions based on knowing, intelligent, and voluntary pleas of guilty
ought to be afforded the highest level of respect.”).  Mello did not present
evidence to the habeas court that his guilty plea was inaccurate, involuntary,
or unknowing.[21]  Cf. id.,
109 S.W.3d at 395 (granting relief in an article 11.07 actual innocence case in
which the complainant recanted, Tuley produced evidence in support of his
several reasons for pleading guilty, and the habeas court found Tuley’s
explanations credible); see also Ex parte Brown, 205 S.W.3d at 548
(denying relief in an article 11.07 actual innocence case and noting that
Brown’s explanation for pleading guilty, even though he was not guilty, was not
“entirely implausible” but “hardly persuasive”).

          Mello
cites Ex parte Thompson, Ex parte Tuley, and Ex parte Elizondo
in support of his arguments.  See Ex parte Thompson, 153 S.W.3d at
416;[22] Ex parte Tuley,
109 S.W.3d at 388;[23] and Ex parte Elizondo,
947 S.W.2d at 202.[24]  These cases are
distinguishable both procedurally and factually.  In each case, the habeas
court found that the applicant had met his burden of proving actual innocence
with newly discovered evidence, and the court of criminal appeals, acting on
the habeas court’s recommendation in each case, granted relief.  In this case,
Mello asks us to overturn the habeas court’s ruling.  As previously noted, our review
of an article 11.072 habeas claim is more limited than that of the court of
criminal appeals’s review of an article 11.07 habeas claim.

In
reviewing the record before us, we find nothing contrary to the habeas court’s
findings of fact.  Further, based on our review of the law and the record
before us, we cannot say that the habeas court abused its discretion by denying
Mello habeas corpus relief.  We therefore overrule Mello’s sole point.

IV.  Conclusion

          Having
overruled Mello’s sole point, we affirm the trial court’s judgment denying
habeas relief. 

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
DAUPHINOT, GARDNER, and WALKER, JJ.

 

PUBLISH

 

DELIVERED:   October 27,
2011









[1]Because the petition for
discretionary review was filed on August 30, 2011, before rule 50 was abolished
effective September 1, 2011, that former rule still applies to this appeal.





[2]See Tex. Code Crim.
Proc. Ann. art. 11.072, '
1 (providing that this article establishes the procedures for an applicant to
seek habeas corpus relief “from an order or a judgment of conviction ordering
community supervision”); Ex parte Hiracheta, 307 S.W.3d 323, 325 (Tex.
Crim. App. 2010); Ex parte Cummins, 169 S.W.3d 752, 756 (Tex. App.—Fort
Worth 2005, no pet.); see also Ex parte Enriquez, 227 S.W.3d 779, 781–83
(Tex. App.—El Paso 2005, pet. ref’d) (concluding that trial court had
jurisdiction to consider habeas corpus application filed by defendant who had
been discharged from deferred adjudication community supervision).





[3]Mello challenged the
legality of the trial court’s order deferring adjudication and imposing
community supervision.  See Tex. Code Crim. Proc. Ann. art. 11.072, ' 2(b)(1).  Mello asserted
that, even though he has been discharged from community supervision, he
continues to suffer from illegal restraint by the State—e.g., being registered
as a sex offender (a condition of his community supervision)—which has “caused
him significant problems in his life, including employment issues.”  Mello
asserts this same argument in his appellate brief.





[4]The habeas judge was not
the same judge who imposed Mello’s deferred adjudication community supervision.





[5]An applicant may appeal the
denial of an article 11.072 application.  Tex. Code Crim. Proc. Ann. art.
11.072, ' 8; Ex
parte Villanueva, 252 S.W.3d 391, 396–97 (Tex. Crim. App. 2008).





[6]Herrera v. Collins,
506 U.S. 390, 113 S. Ct. 853 (1993).





[7]Texas courts recognize two
types of innocence claims, the second of which is a “Schlup claim”—e.g.,
“a procedural claim in which applicant’s claim of innocence does not provide a
basis for relief, but is tied to a showing of constitutional error at trial.”  Ex
parte Franklin, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002) (citing Schlup
v. Delo, 513 U.S. 298, 314, 115 S. Ct. 851, 860 (1995)).





[8]Texas courts have applied
this rule in the context of article 11.072 habeas applications.  See Ex
parte Gonzalez, 323 S.W.3d 557, 561 (Tex. App.—Waco 2010, pet. ref’d) (holding
that an evidentiary hearing on an 11.072 Herrera claim is not required if
the habeas judge presided over the applicant’s trial); Ex parte Franklin,
310 S.W.3d 918, 921–23 (Tex. App.—Beaumont 2010, no pet.) (requiring an
evidentiary hearing on an 11.072 Herrera claim if the habeas judge did
not preside over the applicant’s trial); Ex parte Irwin, No.
02-09-00282-CR, 2009 WL 3720176, at *1 (Tex. App.—Fort Worth Mar. 24, 2010,
pet. ref’d) (mem. op.) (not designated for publication) (affirming trial
court’s denial of an 11.072 actual innocence and an ineffective assistance
claim).





[9]As the court of criminal
appeals explained in Ex parte Tuley: 

The guilty plea process is not
perfect.  But guilty pleas allow the parties to avoid the uncertainties of
litigation.  The decision to plead guilty, as we have seen in this case, may be
influenced by factors that have nothing to do with the defendant’s guilt.  The
inability to disprove the State’s case, the inability to afford counsel, the
inability to afford bail, family obligations, the need to return to work, and
other considerations may influence a defendant’s choice to plead guilty or go
to trial.

109 S.W.3d
388, 393 (Tex. Crim. App. 2002).





[10]“[C]lear and convincing
evidence is an intermediate standard of proof which falls between the ordinary
civil ‘preponderance of the evidence’ standard and our usual ‘beyond a
reasonable doubt’ standard in criminal cases.”  Ex parte Elizondo, 947
S.W.2d at 212 (Baird, J., concurring).  “Clear and convincing evidence is
defined ‘as that measure or degree of proof which will produce in the mind of
the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.’”  Id. (quoting State v.
Addington, 588 S.W.2d 569, 570 (Tex. 1979)).





[11]At the habeas hearing,
the habeas court took judicial notice of the original court file in this case
as well as the affidavits, documents, and photographs that the parties
presented in their habeas pleadings.  While the habeas record does not contain
a separately designated copy of the original court file, a copy of either the
complete file or a large portion of it is attached to Mello’s habeas
application.





[12]In February 1994,
Montgomery testified in Joe L.’s trial that he had seen “a guy named Jimmy” who
worked at the Dairy Queen at the L. house having sex with J.A.L.





[13]For example, Mello’s
niece, Alexas Hobbs, states that she was raised by “James’[s] mom,” grew up
with Mello, and “through that time we have always called him James.”  Although
other witnesses made similar statements, they did not provide a specific time
frame and did not profess to know Mello at the time of the 1990 offense.  For
instance, David Nieland states that “[i]n all the years” that he had been a
client of Mello’s, he had “never heard him go by Jimmy, Jim, or any other names
besides James.”  Matthew Mowles states that he has “never heard anyone refer to
James Mello as ‘Jimmy’” and that Mello’s mother introduces herself as “‘James’[s]
Mother.’”





[14]Notably, Mello admitted
to an investigator in 1993 that he had been in the L. home “many times.”





[15]The parties and the court
referred to this photograph as “the big picture with a blue background.”  This
photo, Photo A, is not dated.





[16]The State advises that
this undated photograph was part of its investigation file and that it is reasonable
to deduce that the picture was taken before Mello pleaded guilty in 1994.





[17]Although the exact date
of the driver’s license picture is not provided, it was shown to J.H. and
Montgomery at the time of the original investigation.





[18]At the beginning of the
habeas hearing, the habeas court noted as to Tomlin’s statements,

[W]hen there are affidavits and four documents all
which totally conflict, I’m not sure what weight any sound factfinder would
give to conflicting documents in sorting out what’s the truth in a vacuum, but
I don’t know what other evidence will be presented in this hearing, and it may
or may not have the same impact, favorably or unfavorably, if he took the stand
and testified.

. . .  I will state I’m quite skeptical of the weight
that might be given to them in light of the fact that there are multiples. 
There’s a written statement that purports to be notarized, although there’s no
seal, and two affidavits, and including a statement of memory failure, and so
I’m just not sure they’re going to count for much.  But I will admit them in
light of all the evidence and not make that decision until I’ve heard all the
evidence and then decide what, if anything, that they add to or detract from
either side’s position.





[19]First, the habeas court stated
in its findings that J.H. “did not see [Mello] sexual[ly] assault [J.A.L.]”; yet,
the court also noted and found credible J.H.’s testimony that he recognized
Mello from when he would come to their house during the time of the sexual
assaults, that Mello “would hang out at their house with Eddie and Donnie,” and
that “there was no one else named Jimmy who would come over to their house.”  Also,
contrary to Mello’s contention that Montgomery’s 1993 affidavit demonstrates
that he was confused as to whether he saw Donnie or Jimmy commit the offense,
Montgomery’s 1993 affidavit states that he saw an individual engage in sexual
acts with J.A.L. and that he thought the individual’s name was “Donnie” but
that, when he identified the offending individual in a photograph, officials
told him the individual’s name was “Jimmy.”  Indeed, the photograph Montgomery
signed was Mello’s driver’s license photo, and after being shown a photo of
“Donnie,” Montgomery verified that the individual he had seen engage in sexual
acts with J.A.L. was “Jimmy” not “Donnie.”





[20]Mello has not been
convicted of the offense to which he pleaded guilty, and we do not comment on
evidentiary sufficiency challenges in deferred adjudication cases.  See
Donovan v. State, 68 S.W.3d 633, 636 (Tex. Crim. App. 2002) (contrasting
deferred adjudication and regular community supervision).





[21]Mello stated in his
habeas application (and echoes in his appellate brief) that “he was told by his
trial attorney that the State had witnesses who would be testifying against him
and, despite his consistent protestations of innocence, he reluctantly agreed
to accept the 3 years deferred adjudication offer from the state.”  Notably,
however, Mello neither tendered his own affidavit nor testified at the habeas
hearing; therefore, his bare allegations do not constitute evidence before the
habeas court.





[22]A jury convicted Thompson
of sexually assaulting his five-year-old daughter based primarily on her
testimony (when she was eight years old), her mother’s testimony, and a torn
dress (allegedly torn by Thompson during an assault).  Id., 153 S.W.3d
at 418.  Thompson testified at the punishment phase that he was “truly sorry
about this happening” and that he would “never let it happen again.”  Id.  At
a habeas hearing twenty years later, various witnesses described the ongoing
custody dispute between Thompson and his ex-wife at the time of the
allegations.  Id. at 419.  The complainant explained that the abuse had
never happened, that she was afraid of her mother, and that her mother had
pressured her into accusing her father of sexual abuse.  Id.  The mother
denied these allegations but admitted to having doubts about whether Thompson
had sexually assaulted her daughter.  Id.  A bus driver testified that,
around the time of the allegations, he witnessed the complainant fall on the
bus and tear her dress.  Id.  A social worker testified that the
complainant’s recantation was “valid.”  Id. at 420.  Thompson testified
that his attorney had advised him to say he was sorry for what he had done so
he would receive a more lenient sentence.  The habeas court recommended that
relief be granted, and the court of criminal appeals agreed.  Id.





[23]In Tuley, the
child-complainant testified at trial that Tuley, her mother’s live-in boyfriend,
had sexually molested her.  Id. at 411.  Her mother testified that
around that same time, Tuley had stopped having sex with her and the child’s
behavior had changed drastically for the worse.  Id.  The mother kicked
Tuley out of the house and called the police.  Id. at 412–13.  Almost
immediately after telling her mother of this abuse, the child admitted to
friends that she had fabricated her story to get Tuley out of her home, but
these friends did not testify to this at trial.  Id. at 396.  Tuley’s jury
deadlocked on the question of guilt, which led to Tuley pleading guilty to an aggravated
sexual assault charge.  Id. at 389–90.  Two years later, the child recanted,
explaining she “hated” Tuley and had wanted him out of the house.  Id.
at 396.  Tuley explained that he pleaded guilty because he was unable to make
bail, and keep retained counsel, and he had already spent ten months in jail
awaiting his first trial and would have had to continue his incarceration
during a second trial.  Id. at 395.  He was addicted to drugs at the
time.  Id.  The convicting court recommended granting relief, finding
that “the evidence of [Tuley’s] guilt is so far outweighed by the evidence of
[his] innocence as to be entirely one-sided.”  Id. at 397.  The court of
criminal appeals agreed.  Id.





[24]Elizondo was convicted of
aggravated sexual assault based primarily on the testimony of his stepson
Robert.  Id., 947 S.W.2d at 209.  Thirteen years later, Robert recanted,
stating that his natural father “relentlessly manipulated and threatened [him]
into making such allegations against [the defendant] in order to retaliate
against [his] natural mother, [the natural father’s] ex-wife, for marrying [the
defendant] years before.”  Id. at 210.  The habeas court concluded that
Robert had testified falsely at trial and recommended granting relief.  The
court of criminal appeals granted relief, stating that “another jury hearing
the evidence, including the newly discovered mature recantation of Robert’s
juvenile testimony, would view the new evidence as the more credible and would
acquit applicant.”  Id.