COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



§

§

EX PARTE: MIGUEL SALAZAR

§

§

§

§

§

No. 08-14-00243-CR

Appeal from the

409th District Court

of El Paso County, Texas

(TC# 20050D03190-409-2)

# **O P I N I O N**

Miguel Salazar appeals the trial court's denial of his request for habeas corpus relief from community supervision under TEX.CODE CRIM.PROC.ANN. art. 11.072 (West 2015). In four issues, Salazar contends that he is entitled to habeas relief because his trial attorney was constitutionally ineffective by failing to timely file a notice of appeal after conviction, and because substantial affidavit evidence, including a sworn recantation from the alleged victim, conclusively shows that Salazar is actually innocent of the aggravated sexual assault of a child charge for which he was convicted. Alternatively, Salazar maintains that the trial court erred by foregoing live testimony at an evidentiary hearing and instead rendering its writ decision based solely on a cold documentary record.

We affirm the trial court's denial of relief on ineffective assistance of counsel grounds for

procedural reasons, but reverse and remand for an evidentiary hearing on actual innocence.

## BACKGROUND

Salazar was indicted on one count of aggravated sexual assault of a child after his niece M.M.,[1] who was ten years' old at the time, accused him of sexually assaulting her when she was five years' old. At trial, Salazar testified in his own defense and denied ever sexually assaulting M.M. During direct examination, M.M., who was eleven years' old at the time of trial, described the sexual assault, stating that when she was five and living with Salazar and his wife while her mother was living in Ciudad Juarez, Mexico, M.M. woke up to Salazar pulling her pants down. He then placed his penis about an inch inside her vagina. M.M. testified that the assault lasted between one and five minutes, and that prior to the assault, Salazar had been watching "dirty movies" and was "hyper." She further testified that this was the only incident of sexual misconduct Salazar committed, although at a statutory outcry hearing held outside the presence of the jury, a police officer testified that M.M. had told him that Salazar penetrated her twenty to thirty times, indecently touched her on multiple occasions, and exposed himself to her.

M.M. told the jury that she did not tell anyone about being raped by Salazar for several years because he had threatened to kill her if she said anything. M.M. admitted that she had previously told family members that Salazar had not sexually assaulted her, but that somebody else had. However, she explained that she made that statement under pressure from Salazar, his wife Sylvia, and their daughter Viviana:

> Q.   Was there ever an incident where you were confronted by some family members, and you denied this happened and said somebody else did it?
>
> A.   Yes, sir.
>
> Q.   Can you tell us how that came about?

---

[1] We refer to the complaining witness in this case by a pseudonym because she was a minor at the time of the offense.

2

A.      My -- my aunt?  My aunt Sylvia Salazar?  Told my mom that she was going to take me to the Pizza Hut --

[Intervening objections to non-responsiveness and hearsay omitted]

                                    .         .         .

Q.      (BY MR. CALLAN) First of all, let's clarify.  Who were the people that you told that it wasn't your uncle and that it was someone else?

A.      My aunt and my sister [sic] Vivana [Viviana is actually M.M.'s cousin]

Q.      All right.  How is it that you -- and who else was there?

A.      My uncle.

Q.      Okay.  How is it that you were with your aunt and your uncle and Viviana, even though you had already reported this to the police?

A.      Because my mom let me go to the pizza with them.

Q.      All right.  She let you go to where?

A.      To the pizza.

Q.      To the pizza what?

A.       Pizza Hut.

Q.      Okay.  All right.  And when your -- and when you say 'with them,' does that -- who does that include?

A.      With my aunt, my uncle, and my cousin Viviana.

Q.      All right.  So your uncle was at the Pizza Hut?

A.      (Nods head.)

Q.      All right.  Did you go straight to the Pizza Hut?

A.      No, sir.

Q.      Where did you go first?

A.      To my uncle house [sic].  To my uncle's house.

3

Q. Okay. And what happened at your uncle's house?

A. They -- they confronted me to tell lies.

Q. What do you mean by that?

A. To tell no, that my uncle didn't do anything bad, that it was another person.

Q. Okay. And did this other person do anything bad to you?

A. No, sir.

Q. Who did the bad thing to you?

A. My uncle.

Q. Okay. And you're telling us the truth?

A. Yes, sir.

Q. You're not trying to get back at your uncle because you don't like him or anything like that?

A. No, sir.

Q. All right. And how old were you when this happened?

A. Uh . . . When the incident happened? [ellipses in original]

Q. Well, when it actually happened, how old were you?

A. Five years old.

Q. That's the best you can remember?

A. Yes, sir.

Following trial, the jury convicted Salazar of one count of aggravated sexual assault of a child. Judge Christopher Antcliff, then judge of the 409th District Court, entered the judgment of conviction on June 26, 2008 and ordered community supervision for five years. That judgment was not appealed.

4

On October 31, 2008, Salazar filed his first Article 11.072 application for habeas corpus relief before Judge Sam Medrano, the newly-elected judge of the 409th District Court. In his application, Salazar raised one ground for relief: namely, that he was "convicted on false or perjured evidence of [the] complaining witness." Salazar alleged that since the trial, the complaining witness;

> [M]ade statements to family members, as well as non-family[] members that she did not tell the truth. In fact, she has stated that the Applicant was wrongfully accused and that her mother encouraged her to testify falsely. These statements have been made to Luis Angel Carrillo, Jessica Trevino, Victor Salazar, and Viviana Salazar.

Salazar attached affidavits from Sylvia, his wife; Victor, his son; and Trevino. The initial application did not include an affidavit from M.M. Trevino and Victor Salazar testified in their affidavits that at one unspecified point in time, they had gone to a pizza restaurant with Miguel Salazar, M.M., and other family members. When Miguel Salazar went to the restroom, Trevino and Victor Salazar asked M.M. if it was true that Miguel Salazar had molested her. According to them, M.M. said that Miguel Salazar had never touched her and that "Tavo," her mother's boyfriend, had been the one who did it.

Sylvia Salazar, M.M.'s aunt and Miguel Salazar's wife, testified in her affidavit that in October 2005, she received a call from M.M.'s elementary school stating that Sylvia needed to pick up her nieces from school because their mother was drunk. As Sylvia tried to talk M.M.'s mother about her drinking problem, M.M.'s mother started saying that Sylvia and Viviana "could not make her talk." According to Sylvia, "I asked her what she meant to say and she stated that Miguel had sexually molested" M.M. Viviana then accused M.M.'s mother of lying, and M.M's mother replied she was telling the truth. At that point, M.M. told her mother "not to lie anymore, that she knew that the one that had been molesting her was her boyfriend 'Tavo' (Gustavo

5

Ponce). My niece then continue[d] telling my sister that she knew it was him and that he was still doing it, but she could not said [sic] nothing because he had threatened her that if she said something, he will kill her mother."[2]

The trial court forewent an evidentiary hearing and denied Salazar's application.[3] Salazar did not appeal the denial of this writ application.

On August 2, 2013, Salazar filed a second application for a writ of habeas corpus. Salazar raised six grounds for habeas relief. Relevant to this appeal are (1) a claim that Salazar's trial counsel rendered constitutionally ineffective assistance by failing to preserve Salazar's right to appeal because Salazar could not afford to pay the attorney's additional fees, and (2) Salazar's renewed claim of actual innocence. With respect to the ineffective assistance of counsel claim, Salazar alleged that his trial attorney, after telling him that an appeal would cost several thousand dollars, failed to inform him that he could possibly qualify for appointed counsel as an indigent defendant and then withdraw to allow Salazar to seek appointed appellate counsel, and failed to file a notice of appeal on his behalf or otherwise preserve his appellate rights. Salazar stated that he decided not to appeal based on cost, but that if he had been properly appraised of his options, he would have appealed.

Salazar's actual innocence ground repeated the false testimony allegations contained in his first application. However, in his second application, Salazar included both deposition testimony and an affidavit from M.M., then age twelve or thirteen, recanting her trial testimony. In her deposition, M.M., who appeared at the deposition with her maternal grandmother, stated that her trial testimony was not truthful and that she wanted to come forward because her aunt

---

[2] Sylvia Salazar gave substantially similar testimony during her husband's trial. However, she was not allowed to disclose who M.M. said the other person was who allegedly sexually assaulted her.

[3] Two separate denial orders exist in the record; one is signed solely by Judge Medrano, the other is signed by both Judge Medrano and Judge Antcliff.

had cancer and because "my uncle is in jail because of my – what – the things that I – that I said back then." M.M. also recounted physical abuse at the hands of Gustavo Ponce, her mother's boyfriend, and stated that Ponce had urged her to make the false allegation against Salazar. M.M.'s affidavit testimony reads, in relevant part:

> Sometime in 2004 or 2005 my mother's boyfriend, Gustavo Ponce, told me to tell the police that my uncle, Miguel Salazar, was touching my private parts and abusing me. I believe he wanted me to do this because he hated my family. Gustavo hit me and pushed me, and I told him I better do whatever he wanted [sic] or he would make me suffer. I did what he told me to do because I was afraid of him and because he always repeated to me that he would kill my mom or sister, if I didn't do so.
>
> I reluctantly told my mom that Miguel Salazar was touching me. She apparently told the school counselor who then called the police. When the police got there, I told them what Gustavo Ponce had told me to say about Miguel Salazar; that he was touching me, sexually abusing me. I never told them that Gustavo had hit me or threatened me because I was scared. He had told me that if I didn't do what he wanted, he would kill my mom or do something to my sister, his own daughter.
>
> I know that my story was untrue but I figured that if I said Miguel Salazar abused me many times, my story would be more believable. Like I said I was afraid of Gustavo Ponce and I figured it was the best way to protect myself and my family.
>
> It occurred to me that I might be subjected to a medical exam and I was worried that it would show I was lying, since Gustavo Ponce lived in my house and I was afraid for my and my family's safety. During this period of time Gustavo would often threaten me when I was alone that I should keep saying that I was sexually assaulted – I felt trapped. There was no way for me to tell the truth.
>
> No one ever took me to a doctor to be examined. A medical examination would have revealed that I am a virgin. I am willing to submit myself to a medical exam for those purposes.
>
> I never told my mom that what I said about Miguel Salazar was not true because I was afraid to tell her. Even after my mom and Gustavo were separated, he still lived very close and we would see him often. He would look at us and was still trying to get back together with my mom.
>
> I was also afraid to tell the truth because a detective had told us that if we changed our story, both my mom and I could end up in jail.
>
> At the trial I testified that the sexual assault only happened once. Even though the prosecutor kept asking me so that I could say it happened more than once, I refused to do so. I knew that I was lying about any sexual abuse or assault having taken place, but I felt that I couldn't say that it never happened or I might end up in jail for lying. On the other hand I also knew that it was all a lie, so I

7

didn't want to get Miguel Salazar in trouble. I am very sorry that I didn't speak truthfully on the day of trial or to the police who investigated the case.

I now live with my aunt . . . in Arizona. She has a guardianship over me and she is here with me today as I give this statement. I am signing this affidavit because I want to speak the truth concerning the matters regarding Miguel Salazar that were the subject of the case . . . . She has allowed me to come forward and approves of my desire to set matters straight.

I hereby wish to state that Miguel Salazar never touched any of my private areas or sexually abused me in any way.

The trial court again did not conduct an evidentiary hearing and rejected Salazar's writ application based solely on the affidavit and deposition evidence, filing various findings of fact and conclusions of law. This appeal followed.

## DISCUSSION
### Standard of Review and Applicable Law

Article 11.072 establishes the habeas corpus procedures by which an applicant who is convicted of a crime and placed on community supervision can challenge the validity of either the conviction or the conditions of community supervision. TEX.CODE CRIM.PROC.ANN. art. 11.072, §§ 1-2(b). We review a trial court's decision on an Article 11.072 petition for abuse of discretion. *Ex parte Crook*, No. 08-08-00313-CR, 2010 WL 2961580, at *3 (Tex.App.--El Paso July 28, 2010, pet. ref'd)(not designated for publication).

Article 11.072 also places restrictions on the filing of multiple writs of habeas corpus. After a trial court considers and rejects an applicant's initial Article 11.072 habeas corpus application, the court may not consider further Article 11.072 applications unless the new application contains sufficient specific facts "establishing that the current claims and issues have not been and could not have been presented" in a previous application "because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." TEX.CODE CRIM.PROC.ANN. art. 11.072, § 9(a). A legal basis is previously unavailable when, at the time of the previous application, it was "not recognized by and could not have been

8

reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state[.]" TEX.CODE CRIM.PROC.ANN. art. 11.072, § 9(b). A factual basis is considered unavailable if "was not ascertainable through the exercise of reasonable diligence on or before" the date of the previous application. TEX.CODE CRIM.PROC.ANN. art. 11.072, § 9(c). The rejection of an initial habeas corpus application is the trigger event for the Section 9 subsequent application restrictions. *Ex parte Betancourt*, No. 08-05-00063-CR, 2006 WL 1875576, at *2 (Tex.App.--El Paso July 6, 2006, no pet.)(not designated for publication).

### *Evidentiary Hearing*

As a threshold matter, Salazar contends in Issues Two and Three that the trial court abused its discretion by failing to hold an evidentiary hearing before deciding whether or not to render habeas relief.[4] The State counters that the plain language of the statute makes it essentially impossible for a trial court to abuse its discretion with respect to whether or not it

---

[4] The State also argues as a threshold matter that we should affirm the trial court because Salazar requested an out-of-time appeal rather than a new trial, and that by requesting the wrong remedy, the habeas application was essentially defective *ab initio*. In support of its contention, the State cites *Ex parte Sheikh*, No. 03-10-00370-CR, 2012 WL 3599826, at *14 (Tex.App.--Austin Aug. 17, 2012, pet. ref'd)(mem. op., not designated for publication). In that case, the Third Court of Appeals held that the defendant's request for an out-of-time appeal did not constitute an attack on either the validity of his conviction or the terms of his community supervision as required by Article 11.072. As such, the trial court was powerless to grant relief on the application. *Id*.

The Third Court of Appeals has subsequently clarified that *Ex Parte Sheikh* should not be read as justification for rejecting an Article 11.072 habeas application in which a defendant requests an out-of-time appeal rather than a new trial. Rather, our sister court recently held that *Ex parte Sheikh* only applied to the unique fact pattern presented in that case—namely, (1) Sheikh conceded in his brief that he was not challenging his conviction, but only seeking to vindicate an appeal right in light of the trial court's failure to follow a plea agreement; (2) Sheikh affirmatively and voluntarily waived his right to appeal as part of a plea agreement; and (3) there was no evidence the trial court failed to follow the plea agreement given that by requesting an appeal, a defendant necessarily challenges his conviction as unlawful. *See Ex parte McCarty,* No. 03-14-00575-CR, 2015 WL 2089091, at *3 n.3 (Tex.App.--Austin Apr. 29, 2015, no pet.)(mem. op., not designated for publication). The Court in *Ex parte McCarty* noted that by requesting an appeal, a defendant implicitly attacks a conviction or sentence as being unlawful, and the Court also cited numerous cases in which the appellate courts suggest that Article 11.072 applicants may be entitled to out-of-time appeals as a remedy. *See id*. at *3 (citing cases).

We note that *Ex parte Sheikh* as an unpublished case is not binding on this Court or on our sister court in Austin, and we agree with the *Ex parte McCarty* court that requesting an out-of-time appeal rather than a new trial is not a sufficient reason to justify rejection of an Article 11.072 habeas application, since requesting an appeal necessarily implies that a defendant seeks to attack a conviction or sentence. The distinguishing factors in *Ex parte Sheikh* are also not present in this case; Salazar did not plead guilty, but was convicted by a jury, and he clearly asserts that the conviction was erroneous in his application.

holds a pre-decision habeas hearing. Upon review of authority from our sister courts and the record presented, we find that the trial court did not abuse its discretion by deciding the ineffective assistance of counsel issue on affidavits alone. However, the trial court should have held a hearing with respect to Salazar's actual innocence claim.

Upon receiving a habeas corpus application, the trial court may dispose of it in one of two ways. "If the court determines from the face of an application or documents attached to the application that the applicant is manifestly entitled to no relief, the court shall enter a written order denying the application as frivolous." TEX.CODE CRIM.PROC.ANN. art. 11.072, § 7(a). "In all other cases, a second procedure applies, and the trial court cannot rule on the application without entering findings of fact and conclusions of law." *Ex parte Baldez*, No. 04-13-00494-CR, 2014 WL 1908952, at *2 (Tex.App.--San Antonio May 14, 2014, no pet.)(not yet published). In this case, the trial court entered findings of fact and conclusions of law, meaning that the court did not find the application frivolous on its face. We review a trial court's decision to hold an evidentiary hearing to evaluate a non-frivolous habeas petition for abuse of discretion.

"Article 11.072 does not require a hearing when the issues can be resolved without one." *Ex parte Arjona*, 402 S.W.3d 312, 319 (Tex.App.--Beaumont 2013, no pet.); *see also Ex parte Cummins*, 169 S.W.3d 752, 757 (Tex.App.--Fort Worth 2005, no pet.). The courts of appeals generally agree that no evidentiary hearing is *per se* required when an applicant brings an Article 11.072 claim for ineffective assistance of counsel. *See, e.g., Ex parte Crook*, 2010 WL 2961580, at *4 (noting in ineffective assistance of counsel case that "[f]rom the plain language of the statute it is clear that the decision whether to hold a hearing is within the discretion of the trial court"). We agree that on this record, the pleaded ineffective assistance issue could be decided without resorting to in-court testimony, since, as we explain below, this claim is facially barred

10

by Article 11.072's abuse-of-writ provisions.

Whether an evidentiary hearing is required when an applicant raises an actual innocence claim is another matter. Our sister court in Beaumont has held that an evidentiary hearing is required if a habeas applicant raises an actual innocence claim. *Ex parte Franklin*, 310 S.W.3d 918, 921-23 (Tex.App.--Beaumont 2010, no pet.)(victim's affidavit admitting past claims of sexual molestation were untrue constituted "affirmative evidence" of defendant's innocence that entitled him to evidentiary hearing). Recognizing the Beaumont Court of Appeals' ruling, the Waco Court of Appeals nevertheless held that even under the rule set out in *Franklin,* no evidentiary hearing is required "if the habeas judge is the same judge who presided over the applicant's trial." *Ex parte Gonzalez*, 323 S.W.3d 557, 558-60 (Tex.App.--Waco 2010, pet. ref'd). The court in *Ex parte Franklin* also recognized that trial courts may forego evidentiary hearings in actual innocence cases if such a hearing is "impractical." *Ex parte Franklin*, 310 S.W.3d at 922-23.

This Court has never squarely addressed the issue of whether a trial court must hold an evidentiary hearing in an actual innocence case, nor do any of our sister courts appear to directly contravene *Franklin* or *Gonzalez*.[5] While we do not today hold that an evidentiary hearing is *per se* required in every actual innocence case, we recognize that *Franklin* and *Gonzalez* set out discretionary factors the trial court may consider in deciding whether to hold an evidentiary

---

[5] The State cites a string of cases for the proposition that an evidentiary hearing is never required. *See*, *e.g.*, *Ex parte Alfaro*, 378 S.W.3d 677, 679 (Tex.App.--Beaumont 2012, no pet.); *Ex parte Crook*, 2010 WL 2961580, at *4; *Ex parte Carbajal*, No. 08-03-00297-CR, 2004 WL 1772113, at *7-*8 (Tex.App.--El Paso Aug. 5, 2004, pet. ref'd)(mem. op., not designated for publication); *Ex parte Garcia*, No. 10-06-00067-CR, 2006 WL 2876758, at *1 (Tex.App.--Waco Oct. 4, 2006, no pet.)(mem. op., not designated for publication). However, none of the cases the State cites in support of its contention deal with actual innocence claims; rather, they simply state that when an applicant raises ineffective assistance of counsel claims in an Article 11.027 habeas application, a trial court hearing is not required *per se*. The *Franklin* court recognized similar authorities and distinguished ineffective assistance of counsel claims from actual innocence claims. *Ex parte Franklin*, 310 S.W.3d at 922. Although we do not frame our holding as broadly as that in *Franklin*, because *Franklin* is published and deals specifically with evidentiary hearings in actual innocence cases involving recantation from child complaining witness in a sexual assault of a child case, we will follow the approach laid out there.

hearing in an actual innocence case. We further hold that under these circumstances, an evidentiary hearing is appropriate. Salazar preserved this issue by requesting an evidentiary hearing, which the trial court denied. *See* TEX.R.APP.P. 33.1 (outlining preservation of error standard); *cf. Ex parte Franklin*, 310 S.W.3d at 933 (stating that "[i]f [defendant] Franklin chose not to call [the victim][,] . . . the trial court can then proceed to make its determination based on its assessment of all the affidavits together with the inculpatory evidence from Franklin's trials"). As in *Franklin*, this actual innocence case involves new, affirmative exculpatory evidence in the form of a sworn recantation from a child witness who has given conflicting accounts of events in various proceedings. *See Ex parte Franklin*, 310 S.W.3d at 922-23. A live hearing would allow the trial judge to make an in-person credibility determination and clarify the record. *Id.* (citing TEX.R.APP.P. 31.3 power of appellate courts in habeas appeals to "make whatever orders the law and the nature of the case require"). Unlike in *Gonzalez*, the judge on habeas review in this case was not the trial judge and thus did not have the previous opportunity to observe the witness's demeanor so as to make a credibility determination, which would render the need for another hearing to determine credibility moot. *See Ex parte Gonzalez*, 323 S.W.3d at 559. Finally, there is no finding in the record indicating that an evidentiary hearing would have been impracticable. *Ex parte Franklin,* 310 S.W.3d at 922.

We also disagree with the State that review of Salazar's actual innocence claim is barred under Article 11.072's abuse-of-writ provisions. As Salazar points out in Issue Four, although his second application repeated the false testimony allegation he made in his first application, both M.M.'s deposition and affidavit in which she directly admits to false testimony were unavailable at the time of the first habeas petition and could not have been obtained through the exercise of reasonable diligence. Throughout the course of trial, M.M.'s position was that the

12

accusation she made against her mother's boyfriend was false and that the accusation she made against Salazar was true. Her new affidavit and deposition testimony reversing this previous stance is "new" factual evidence as contemplated by the habeas statute. *See Ex parte Calderon*, 309 S.W.3d 64, 70-71 (Tex.Crim.App. 2010)(child victim's recantation affidavit constituted "newly discovered" and "newly available" evidence under habeas statute); *Ex parte Franklin*, 310 S.W.3d at 922 (characterizing child witness's recantation affidavit as "new" evidence sufficient to allow bypass of Article 11.072 abuse-of-writ provisions and permit review of subsequent application)*; cf. Ex parte Smith*, No. WR-73266-01, 2010 WL 975230, at \*1 (Tex.Crim.App. Mar. 17, 2010)(per curiam, order not designated for publication)(holding, in Article 11.07 context, that co-defendant's recantation of trial testimony was new evidence that might entitle habeas applicant to relief). As such, the trial court may properly review the merits of this claim.

We express no opinion on the merits of Salazar's actual innocence claim. Rather, we remand for an evidentiary hearing so that the trial court may entertain live witness testimony, unless doing so would be impractical. If the trial court cannot hold a hearing because it would be impractical, then the trial court should include such a finding as a supplemental finding of fact and explain the circumstances that would make live testimony impractical. *Ex parte Franklin*, 310 S.W.3d at 923.

Issues Two and Three are sustained in part. Issue Four is sustained.

### *Ineffective Assistance of Counsel and the Abuse-of-Writ Bar*

We next turn to Salazar's ineffective assistance of counsel claim. In Issue One, Salazar maintains that by failing to either withdraw as counsel after trial or else file a notice of appeal on his behalf, trial counsel effectively deprived him of the right to appeal. *See Ex parte Axel*, 757

S.W.2d 369, 374 (Tex.Crim.App 1988)(noting in Article 11.07 case that trial counsel has duty to advise client of right to appeal and to protect clients appellate rights; failure to do so could give rise to ineffective assistance claim). The State does not disagree that failure to advise a client of the right to appeal *pro se* or else take steps to preserve a client's right to appeal constitutes ineffective assistance of counsel. Rather, the State asserts that Article 11.072's abuse-of-writ provisions strip us of jurisdiction to review Salazar's ineffective assistance of counsel claim because he failed to raise it in his first habeas application. We reluctantly agree.

Under current Texas habeas jurisprudence, we are barred from reviewing Salazar's arguably colorable ineffective assistance of counsel claim on its merits under Article 11.072's abuse-of-writ provisions. Salazar could have raised the ineffective assistance of trial counsel arguments in the first habeas proceeding, since both the legal and factual bases for an ineffective assistance of counsel claim were available at the time of the initial habeas petition. *Cf. Ex parte Fontenot*, 3 S.W.3d 32 (Tex.Crim.App. 1999)(dismissing Article 11.07 successive habeas application where applicant who alleged appellate counsel failed to advise of the right to seek discretionary review could have raised that claim in first habeas). The fact that counsel in the initial habeas proceeding failed to raise the claim is legally irrelevant, since under the current state of the law, Texas state courts have no authority to bypass the abuse-of-writ statute on equitable grounds, and a prisoner has no constitutional right to effective assistance of counsel on habeas corpus review that would otherwise permit review of forfeited claims in subsequent writs. *See Ex parte Graves*, 70 S.W.3d 103, 105 (Tex.Crim.App. 2002)(no right to effective assistance of counsel on collateral review).[6]

---

[6] We note the law on this point is in flux. The United States Supreme Court recently held that Texas prisoners may raise ineffective assistance of trial counsel grounds in an initial federal habeas petition, even where the claim was forfeited under Texas' abuse-of-writ statute, because failure to receive effective assistance of counsel in an initial collateral review habeas case was of such great importance that review of those forfeited claims was required. *See*

Salazar maintains that by requesting an out-of-time appeal rather than a new trial, he can escape the strictures of the subsequent writ ban imposed by Section 9 because he is not seeking to "attack" the conviction, citing *Ex parte McPherson*, 52 S.W.3d 860, 861 (Tex.Crim.App. 2000). We disagree with Salazar for three reasons. First, *Ex parte McPherson* is a case interpreting Article 11.07 habeas procedures, not the special habeas procedures enacted in community supervision cases set out in Article 11.072. Second, as we previously stated, a request for an out-of-time appeal *is* an implicit attack on the validity of a conviction or sentence, which not only makes Salazar's claim cognizable under Article 11.072, but also subject to the Section 9 subsequent writ restrictions. Salazar cannot argue that requesting an out-of-time appeal constitutes an attack on the legal validity of a conviction as to one section of Article 11.072 (cognizability) and then argue that it is not an attack on a conviction as to another section (the abuse-of-writ provisions). It is either an attack on a conviction for all purposes, or for no purposes. Finally, case law makes clear that Section 9's restrictions are triggered by the rejection of an initial petition, not by the type of claim pleaded in a second petition. Because Salazar's previous petition was rejected, because Section 9's abuse-of-writ provisions prohibit us

---

*Trevino v. Thaler*, 133 S.Ct. 1911, 1921, 185 L.Ed.2d 1044 (2013). In effect, the Supreme Court created an equitable bypass mechanism of Texas' abuse-of-writ provisions to allow for federal review of colorable state trial claims. However, it did so by interpreting a federal statute governing how federal courts process habeas claims, the Antiterrorism and Effective Death Penalty Act. *Id.*; *see also Martinez v. Ryan*, 132 S.Ct. 1309, 1319-20, 182 L.Ed.2d 272 (2012). The Supreme Court expressly did not constitutionalize the right to effective assistance of counsel in an initial habeas review, instead stating that federal courts would review cases Texas courts would not reach and inviting the Texas Court of Criminal Appeals to reassess the state's abuse-of-writ procedures in light of new federal case law. *Trevino*, 133 S.Ct. at 1921; *Martinez*, 132 S.Ct. 1319-20.

As of the date of this opinion, Section 9's abuse-of-writ provisions remain the same, and the judges of the Texas Court of Criminal Appeals have split over whether similar abuse-of-writ provisions should be changed at all, and if so, whether that change must come from the Court itself or from the Legislature. *See generally Ex parte McCarthy*, No. WR-50360-04, 2013 WL 3283148, at *2-*5 (Tex.Crim.App. [per curiam] Jun. 24, 2003)(order, not designated for publication)(Cochran, J., concurring)(arguing that similar abuse-of-writ provision in another habeas article was clear and could not be disregarded on equitable grounds, and that the Legislature is the branch that should change the law given the financial costs more habeas procedures would impose); *see also generally id.* at *5-*11 (Alcala, J., dissenting)(referring to Trevino as "Sequel to *Gideon* [*v. Wainwright*]" and calling on Texas Court of Criminal Appeals to either re-write the Rules of Appellate Procedure or re-read *Graves* as permitting equitable review of otherwise forfeited ineffective assistance of counsel claims).

from considering the ineffective assistance of counsel claim, and because neither the Texas Court of Criminal Appeals nor the Legislature has provided us with a way to bypass Section 9's restrictions, we must affirm the trial court's ruling as to the ineffective assistance of counsel grounds.

Issue One is overruled.

June 15, 2016

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Publish)